FANNIE HOBBS ET AL., TRUSTEES, APPELLEES, V. BOARD OF EDUCATION OF NORTHERN BAPTIST CONVENTION ET AL., APPELLANTS.

FILED MARCH 16, 1934. No. 28721.

418

*C. C. Caldwell* and *H. G. Wellensiek,* for appellants.

*A. G. Abbott, E. L. Mahlin, Paul B. Newell, Cleary, Suhr & Davis, Edward F. Hannon, Harry S. Grimminger* and *Herbert F. Mayer, contra.*

Heard before Goss, C. J., Rose and Paine, JJ., and Carter and Redick, District Judges.

Redick, District Judge.

This action in equity is brought by Fannie Hobbs and others constituting the board of trustees of Grand Island College, a corporation, for the purpose of obtaining instructions from the district court for Hall county as to the proper disposal of certain funds now in their possession, and called and alleged to be "endowment funds" of said college. These funds came to the plaintiffs under certain contracts, pledges and agreements hereinafter more particularly described and were kept separate from the general funds of the college under the name of a so-called endowment treasurer and subject to the control of certain of the trustees appointed as an endowment committee by the board. The college was organized in 1892 and functioned as an educational institution until September 1, 1931, at which date its financial condition was such that it was unable to continue its operations and the col-

lege was closed, with a large indebtedness staring it in the face, consisting of a mechanic's lien, a number of judgments and numerous other creditors. The college was organized and sponsored under the auspices of the Baptist denomination and the subscriptions and payments to the "endowment fund" were almost entirely received from organizations and individuals of that denomination.

In anticipation of the final catastrophe toward which the college was tending, on May 6, 1931, the college entered into a written contract with the Sioux Falls University of Sioux Falls, South Dakota, an educational institution operated and endowed under the auspices of the Baptist denomination, for the consolidation and merger of said college and university, such merged institution to be organized under the name of the Sioux Falls College and to be operated at said city of Sioux Falls. Both colleges are under the jurisdiction of the Northern Baptist Convention, the supreme governing body over the educational institutions of the Baptist denomination in Nebraska, South Dakota, and other states. At the time of closing, the college owned property of the value stated to be $249,500, consisting principally of the campus and college buildings, which is alleged to be unmarketable and incapable of being sold for an amount sufficient to pay its indebtedness; also, certain real estate and securities alleged to constitute a general endowment fund; also a number of other securities alleged to constitute annuity, scholarship, memorial and other special funds to which reference will be made hereafter.

The prayer of the petition is for the judgment, direction and advice of the court as to the administration of their trust and their duties in connection therewith, for a decree finding whether the funds or properties in their control, or any part thereof, are subject to the payment of the indebtedness of the college, and, if so, determining the priorities, if any, as between such creditors, determining the rights and equities, if any, of the several donors and contributors to said endowment fund and the holders of

agreements for the payment of annuities, a decree approving and confirming the contract between Grand Island College and Sioux Falls University and appointing trustees as successors of plaintiffs of the endowment funds and properties of the college, and for an order allowing payment of plaintiffs' attorneys for legal services in this action. Other matters with respect of which relief is prayed will be referred to later.

The defendants may be divided into five general groups:

(1) The board of education of Northern Baptist Convention, successor to American Baptist Education Society, which contributed, at various times, the sum of $21,275 to the "endowment fund," and which claims that the said endowment fund constitutes a charitable trust and consents that the same may be transferred to Sioux Falls College.

(2) Contributors to said endowment fund subject to payment of certain annuities during the life of the contributor, to wit: Lauretta J. Schreiner, $26,500; Frank J. Pierce, $1,000; Eva H. Coon, lots in Grand Island said to be worth $1,500; Minnie A. Tavender, $500; A. D. Turnbull, $3,100; Jefferson D. Yelton, $2,000.

(3) Other contributors to the endowment fund without special conditions: John R. Webster, $5,000; and a large number of contributors of various amounts which are not divulged in the evidence.

(4) Amounts contributed as memorials or for scholarships: Victor Person, $2,000; Philip Kinney, $500; and four unpaid notes—Mildred E. Person, $2,500; George E. Warren, $2,000; Alice J. Roessler, $100; Gertrude Martin, $500.

(5) Persons holding judgments against the college, to wit: Grand Island Plumbing Company, mechanic's lien in decree; Chicago Lumber Company, Harry Grimminger, and city of Grand Island, and numerous other creditors who are not named as parties.

Nearly all of the contributors to the endowment, special funds and annuities above named and a number of others have joined in the prayer of the petition or filed consent

that what remains in said funds may be transferred to Sioux Falls College. Answers were filed by a number of the defendants, but it will not be necessary to set them out at this point; suffice it to say that they raise the following questions: (1) Are the general endowment funds, or any of the annuity or special funds, subject to the claims of creditors? (2) What priorities, if any, exist between creditors? (3) What disposition shall be made of funds, if any, which are not subject to the claims of creditors? It is conceded that all the property, real and personal, except that in the funds mentioned is subject to creditors.

Proper replies were filed and the case submitted to the district court, which rendered its decree finding generally against the plaintiffs, and finding (1) that the contract between Grand Island College and Sioux Falls College was void; (2) that the endowment funds did not constitute a charitable trust and were subject to the claims of creditors; (3) that the funds held under certain annuity contracts, the Patterson, Pierce, Tavender, Turnbull, Yelton, and Coon, were held in trust and charged with certain payments to be made to the beneficiaries; (4) that the Schreiner annuity fund was held in trust under a valid contract, and that the applicable securities in the sum of $15,000 be placed in the Stevens National Bank of Fremont, Nebraska, for safe-keeping and to secure the unpaid instalments under said contract, any surplus to be converted into the college assets, free from any trust for the maintenance of a chair of English Bible; (5) that the claims of judgment and other creditors are valid against the college except a claim of Grand Island College by assignment of one-half of the mechanic's lien of the Grand Island Plumbing Company; (6) that the said mechanic's lien is a first lien against the property covered thereby.

Decree was rendered in accordance with the findings and the receivers theretofore appointed by the court were ordered to convert all of the assets of the college, except those charged with the payment of annuities, into cash,

and to pay (1) an attorney's fee of $500 to plaintiffs' attorney, (2) balance remaining due upon the mechanic's lien, and (3) distribute the remainder among the other creditors *pro rata*. Motions for a new trial were filed and overruled, and the board of education of the Northern Baptist Convention, Sioux Falls University, and Sioux Falls College, all corporations, bring the case here on appeal. The city of Grand Island for itself and all other unsecured creditors of Grand Island College files a cross-appeal.

During the existence of the college as an educational institution numerous donations and contributions were made to the college for the purpose of establishing an endowment fund, in the aggregate about $85,000, of which there remained in the hands of the so-called "treasurer of the endowment fund" $52,400 at the time the college was closed, the remainder having been borrowed by the college for the erection of buildings to the amount of $26,726.41, and some used by the college as collateral security for loans, generally with the consent of the donors.

The first question presented for our determination is whether or not the moneys and securities remaining in the endowment fund constitute a charitable trust, or whether full ownership rests in the college and therefore subject to claims of its creditors.

Article 10 of the articles of incorporation of Grand Island College is as follows: "The board of trustees shall have full power and authority to carry into effect the purposes of this incorporation; shall have the general care and disposal of the funds and property of the corporation for the benefit of the college and may use and invest said property and funds in such a way and manner as may to them seem most effective subject, however, to the laws of this state and the conditions and purposes of special endowments, bequests and donations."

The endowment fund was initiated June 23, 1892, by a gift from "The American Baptist Education Society" under a written proposal in the following terms: "Will con-

tribute to Grand Island College located at Grand Island in the state of Nebraska for the purpose of endowment for said institution, and to be invested and preserved inviolable as such, the sum of $5,000 less 5 per cent. to be retained by this society to defray expenses;" upon condition that the college raise $15,250 in cash or good pledges, not less than $5,000 thereof to be "set apart inviolably as endowment for said college." On November 27, 1899, the society made a further gift under like terms and conditions of $10,000, provided a supplementary sum not less than $25,500 shall be contributed to said college, and "provided, that the whole of said supplemental sum, less expenses incident to the undertaking, shall be set apart and inviolably kept as an endowment fund for the college." These gifts were accepted by the college and the supplemental amounts raised under subscriptions substantially in the following language: "Whereas, the American Baptist Education Society has offered to give the sum of $7,500 towards the endowment fund of Grand Island College, Grand Island, Nebraska, on condition that the further sum of $17,875 is subscribed on or before June 1, 1897. Now, therefore, for the purpose of raising said sum," I promise to pay, etc.; or in the following form: "Whereas, Grand Island College, Grand Island, Nebraska, needs a permanent endowment of $100,000 to enable the trustees to meet the current expenses of the institution on its present economical basis of expenditure and whereas, $35,000 of that sum has already been secured, and whereas, the American Baptist Education Society has given a pledge of $10,000, the same to be binding when Grand Island College shall have secured $25,000 additional: Now therefore to secure the aforementioned pledge and to aid in providing a sufficient endowment," I promise to pay, etc.

The funds donated by the education society $21,275, Mr. Hanson $9,500, as well as all collections made from contributions secured under the pledges above quoted were delivered to the treasurer of the endowment fund of the col-

lege and deposited in the bank under his official designation, and have always been kept separate and distinct from the general funds of the college, which were under the control of the college treasurer. The principal of the endowment fund, with the exceptions heretofore noted, was kept intact and only the interest thereon used for general college purposes. A separate treasurer was elected by the trustees to have charge of the fund under the direction of a committee, called the endowment committee, elected by the board öf trustees of the college from their number.

Under these circumstances and conditions the question recurs: Does this endowment fund constitute a charitable trust? If so, it is not subject to the claims of creditors, and, if not, it belongs to the general assets of the college. Charitable trusts do not differ from numerous other kinds of trusts, except that they are generally affected by a public interest and are looked upon with peculiar favor, it being the policy of the law to sustain them if possible. At common law a trust in the nature of a public charity was looked upon with such favor that it was not permitted to fail even by reason of the impossibility of carrying it out according to the conditions prescribed by the donor; but in such case, and to meet such contingency, there arose the doctrine of *cy pres,* in accordance with which the subject-matter of the trust came under the protection of the King as *parens patriæ,* whose duty and prerogative it was to administer the trust, as nearly as might be, in accordance with the declared wishes of the donor. This doctrine was not generally adopted as a part of the common law in this country, and was never a part of the jurisdiction of nor, until statute 43 Elizabeth, enforced by the court of chancery in England unless in aid of the King's prerogative. In some states, by statute, the prerogative of the King has been conferred upon the legislature, but not in Nebraska. *St. James Orphan Asylum v. Shelby,* 60 Neb. 796. This subject will be further discussed later.

Whether or not an instrument creates a trust or passes full title depends, of course, upon the language of the in-

strument and the intention of the grantor as indicated by the terms he has used; and if such intention is clearly expressed it is the duty of courts to construe the instrument in accordance therewith. It seems perfectly clear to us that the intention of the Baptist Education Society was to create a fund which should not be subject to the exigencies or peril of mismanagement of the institution to which it was given, or subject to the control of its trustees, except for purposes of investment, the interest or income from which alone was to be subject to such control. That the intention of the donor was to create a trust as to the principal of said fund seems to us an incontrovertible proposition. The terms are clear and explicit that the fund is to be preserved inviolate, and the subsequent contributions to the fund were made with special reference to the original donations of the education society.

The intention of the donors to establish a charitable trust having been determined, it remains to determine whether or not they have complied with the requirements of the law governing the creation of such a trust. The contention of the creditor appellees is stated in their brief in the following language:

"No trust is created where property is conveyed or donated to a charitable corporation, although the donor adds that it is to be used for certain purposes, when those purposes are among those for which the charitable corporation was incorporated. One cannot be a trustee of property and a beneficiary at the same time and the legal and equitable title is in the college where gifts are made directly to it."

In support of that proposition they cite a number of cases, some of which will be examined and considered. *Woman's Foreign Missionary Society v. Mitchell*, 93 Md. 199, involved the construction of the following clause in a will: "I direct that my two houses and lots in Mountain Lake Park, Garrett county, Maryland, and my lots in Covington, Kentucky, and the stock in the Southern Building Association held in care of W. G. Hay, of Hagerstown,

Maryland, and all other property, both real and personal, other than that already bequeathed, be sold, and the proceeds thereof, together with whatever moneys I may die possessed, be held in trust by the board of managers of the Foreign Missionary Society of the Methodist Episcopal Church of the United States of America for the following purposes: After all my debts, bequests and provision for my burial, etc., be paid, that sufficient be used to educate as Bible readers in India six girls, one to be named 'Dorcas Sherman;' one 'Avis Cecil Sherman;' one 'Mary Jane Sherman;' one 'Sarah Jennie Sherman;' one 'Jennie Smith;' one 'Grace Mabel Sherman;' the money remaining after that set aside for the education of the aforesaid Bible readers to be applied to the purchase of a building to be used for the education of girls in India to be called the 'M. Adelaide Sherman Home,' and the location of said building to be left to the decision of Bishop Thoburn or his successors." And it was held that the testatrix did not intend to create a trust by the mention of the purpose for which the funds bequeathed were to be used, "because the education of girls in India as Bible readers is the purpose to which the money given would have been applied under the charter of the corporation, and that the words relating to the use of the legacy operate at the most as a condition affecting the expenditure and not to the vesting of the legacy." The result from this holding was that the missionary society became the absolute owner of the fund for the general purposes for which it was organized. The validity of the residuary clause was assailed on the ground that it created a trust whose objects were indefinite and uncertain, the question being raised by the collateral kindred of the decedent. It will be noted that the fund was granted absolutely to the missionary society, the corpus thereof to be expended by it for certain purposes, and it was not contended that the fund had been or was about to be misapplied.

*Clarke v. Sisters of Society of the Holy Child Jesus,* 82 Neb. 85, was where real estate was conveyed to the society

in fee simple, the deed containing the following: "One of the conditions upon which this property is conveyed is that the grantee herein hereby agrees to teach the parochial school children (whose parents are known to be unable to pay) free of charge, and if the grantee herein should fail to use the said property for convent school purposes, or refuse to teach the parochial school children as agreed above, or shall divert said property to any other use, then the said property herein conveyed shall revert to and be the property of the grantor, if living, and, if dead, to his heirs." The school was established and maintained for about 23 years until 1907, when the grantee abandoned the property, declined to maintain a school upon the same in the future, and conveyed the premises to the heirs of John Fitzgerald, deceased, the original grantor. However, in 1888 the grantor and grantee entered into a contract modifying the terms of the original deed, providing that, "if the property described in said deed shall ever, in the judgment of the grantors or grantees, become inadequate or unsuited for the purposes for which the said property is deeded, then the grantees shall have power and authority to sell, pass title and execute deeds of conveyance thereto, upon condition, however, that the proceeds arising from said sale shall be reinvested in other property, which shall be used for the purposes known in said deed of conveyance." After reentry by the heirs of Fitzgerald an action was brought by certain persons belonging to the class specified in the deed (parochial school children whose parents are known to be unable to pay) claiming that the original conveyance created a charitable trust for their benefit and praying that the deed to the heirs of Fitzgerald be canceled. The court held that no trust was created and used the following language: "The general rule appears to be that, where property is conveyed directly to a corporation to hold for purposes for which the corporation was created, no trust for the benefit of others arises. There are no apt words in the deed to create a trust, or making the grantee a trustee of the property. On the

contrary, it is evident that the grantor intended to vest the legal title absolutely in the corporation for use in its corporate business, subject to the conditions named. * * * The property was to be used in the business of the corporation for its own purpose and for its own benefit." The court cited *Bennett v. Baltimore Humane Impartial Society,* 91 Md. 10; *Woman's Foreign Missionary Society v. Mitchell, supra; Erwin v. Hurd,* 13 Abb. N. C. (N. Y.) 91; *Bird v. Merklee,* 144 N. Y. 544; and *Wetmore v. Parker,* 52 N. Y. 450, from which latter case it quotes the following language: "It does not create a trust in any such sense, as that term is applied to property. The corporation uses the property, in accordance with the law of its creation, for its own purposes; and the dictation of the manner of its use, within the law, by the donor, does not affect its ownership or make it a trustee. A person may transform himself into a trustee for another, but he cannot be a trustee for himself." The *Clarke* case and all those cited in its support were cases in which an absolute transfer of the property was made by the donor to be used for the general purposes of the donee, subject only to certain conditions prescribed by the instrument of gift.

*Whitmore v. Church of the Holy Cross,* 121 Me. 391. That case involved the construction of two clauses of a will, one devising to the First Congregational Parish of Gardiner, Maine, a house and lot "as a parsonage" and the other bequeathing to the parish the sum of $1,000 "to be held and invested by trustees to be selected by the parish, the income of the same to be used as far as necessary in keeping said homestead and lot given as a parsonage in repair, also I give and bequeath to said First Congregational Parish the further sum of $2,000 to be held and invested by trustees selected by the parish, the income of the same to be used for the maintenance of singing in the church occupied by said parish." In holding that no trust was created either in the real or personal estate the court said: "It is apparent from the language used that no trust was intended to be created by the testator. It is

true she did indicate in terms that the money given was 'to be held and invested by trustees to be selected by the parish,' but such declaration is not sufficient standing alone to establish a trust. It is simply a direction that the money should be in charge of the trustees to be chosen by the parish, the method employed universally in church management, and a custom well known to the testator." The ground of such holding was that a trust cannot exist where the same person possesses both legal estate and the beneficial interest—citing *Doan v. Ascension Parish,* 103 Md. 662, to the effect that if the legal and equitable interest happen to meet in the same person the equitable is forever merged in the legal. It will be noted with reference to the $2,000 bequest to be invested and the income used for maintaining singing in the church, the entire beneficial interest is in the parish which is both the supposed trustee and *cestui que trust;* while in the present case the real beneficiaries are the students of the college. There are, however, many exceptions to that rule, as where the interest of the parties requires that the legal and equitable estates be kept separate, in which cases equity will prevent a merger. To the proposition that "a college, which is a private corporation, capable of taking and holding property, has the *jus disponendi* as fully as natural persons," and that "gifts of money or property made to it directly, without the intervention of a third party as trustee, are subject to debts, where not exempted by any statute and where no conditions and limitations are expressly made, on breach of which the gift is to revert," the creditors cite *People v. President and Trustees of the College of California,* 38 Cal. 166, where the real property was purchased for value, and the "donations were absolute and unconditional;" also *Tash v. Ludden,* 88 Neb. 292, where subscriptions "were given and paid in the treasury of the corporation without any written condition, trust, purpose or obligation, except that the same were to be used for the purposes of the corporation in purchasing land, erecting buildings, putting them up and supplying

the school," and it was held that the gifts were absolute; also *Trustees v. Barren County Board,* 190 Ky. 565, where all donations, devises or bequests were "to be held by them (the trustees) for the use and benefit of an educational institution, and according to the intention of the donors," without other condition or limitation. The dispute was between the donors and the board as to the surplus remaining after payment of the debts of the college. The gifts were held to be absolute, and the board of education entitled to the surplus under a statute to that effect. The obvious distinction between those cases and the present one is that there the gifts were unconditional, while here the condition was imposed that the principal be kept inviolate and only the income used. A number of other cases are cited to the same effect and distinguishable for the same reason. Also to the point that "a gift to a corporation conditioned upon a use for which said corporation is incorporated makes such gift absolute and not a trust." Conceding this to be a correct statement of the law, it has no application here except perhaps as to the income.

We think that all these cases are distinguishable from the one under consideration by the fact that the absolute control of the corpus of the estate conveyed was transferred to the grantee, while here the body of the gifts and contributions were distinctly stated to be for the endowment of the college, the corpus to be kept intact and inviolable, and the income only to be used for the general purposes of the college. While the legal title or estate may be said to be in the college, it is not an absolute estate. The college is given no control over anything but the income arising therefrom. The college has no beneficial interest in the body of the gift, and the real beneficiaries of the trust are the students who may attend the college for the purpose of education. If the gifts in this case had been unconditionally to the college for the purpose of purchasing a site, building necessary buildings, and maintaining a school for the education of the young, doubtless the cases

cited would be applicable. But, as elsewhere intimated, the intent of the contributors to the endowment fund was clearly to preserve it from mistakes and mismanagement of the trustees, and to provide a permanent fund, the income of which should be used for educational purposes. This is in its very nature a charitable trust, and to put any other construction upon the instruments evidencing the donations would destroy and render nugatory the benevolent intentions of the donors.

While it is said in general terms that to create a trust requires the existence of a donor, a trustee, and a *cestui que trust*, there are many cases where charitable trusts have been declared and enforced, notwithstanding the fact that the trustee and the *cestui* may be the same entity, but where the estate has been received by the trustee under certain conditions or for certain purposes, on the ground that equity will require the conditions upon which the trustee received the estate be complied with. Among those cases we call attention to *Curtis & Barker v. Central University*, 188 Ia. 300. In that case about $52,000 was given to the university on the following condition: "The said sum to be a part of the permanent fund of the college to be known and designated as the Curtis and Barker fund shall be kept distinct from the other funds of the college, and the principal sum to be sacredly held and no part of it to be in any manner consumed by or for the use of the university and in no case shall it be liable for the debts, defaults, liabilities or obligations of the university nor of the donors, but shall be kept on interest well secured and the interest may be used for the benefit of the school." That was an action brought by the donors to recover the fund under a provision for reverter on the ground that the grantee, an institution under the sponsorship of the Baptist denomination, had turned over a portion of its property to the control of the Reformed Church in America and the remainder to the Baptist College in Des Moines, Iowa, the original grantee having been located at Pella, Iowa, and the plaintiffs were permitted to recover. After

saying "The donation clearly creates a trust, which required that the principal should be held intact, and the interest used. It was to be held as a permanent fund"— the court held against the contention of appellant that, where the trustee and *cestui que trust* are the same, the title merges, saying: "But it does not necessarily follow that, under all circumstances, the union of the two estates, even if there is such a union in this case, works a merger. If there is a reason for keeping the estates separate, or if it is necessary to do so to carry out the purposes and intentions of the donors, equity will prevent a merger. *Sherlock v. Thompson,* 167 Ia. 1. Here the instrument making the donation and stating the conditions thereof reserved in the donors an interest and created a trust for the benefit of the college and for their own benefit. To hold that there was a merger would nullify the purposes and intentions of the donors, and destroy the power to create conditions or a reversion."

*Associate Alumni v. General Theological Seminary,* 163 N. Y. 417, was a case where a sum was donated to the seminary for the establishment of a professorship on certain terms and conditions, and it was held that a charitable trust was created, and that an abuse of the trust or misapplication of the fund did not operate to destroy the trust and cause a reversion to the donor or his heirs, but that relief was to be found by application to a court of equity to enforce the trust.

In *Lupton v. Leander Clark College,* 187 N. W. 496 (194 Ia. 1008) a donation of $50,000 was made to the endowment fund of the college without the intervention of trustees to "constitute a permanent endowment fund, the principal of which shall be protected and forever held sacred as such," and it was held to establish a charitable trust for the aid and support of Christian education. It was further held that neither trustees of donor's estate nor residuary legatees had "such interest in the endowment fund that they could maintain action to enjoin a merger of the college with another and the transfer of the en-

dowment fund, unless there was a forfeiture or breach of the contract which resulted in the reversion of the fund donated to the estate of the donor." That "Donations to an endowment fund of a college for the promotion of education are gifts to charity." That it was the duty of the court to ascertain the true intention of the donor, and that "Charitable trusts will not be permitted to fail if the intention of the creator can be carried out and effect be given thereto."

In *Starr v. Morningside College,* 186 Ia. 790, the sum of $2,000 was willed to Charles City College to "be added to and made a part of the endowment fund of the said Charles City College located at Charles City, Iowa, and that the same be in no manner used or disposed of by them;" and while the court declined to enter into a discussion as to whether a trust was created, it held that the gift was not intended to be absolute but to further the cause of education and religion, and that there was no allegation that the principal fund had been or would be diverted and used for any other purpose.

In *In re Estate of Nilson,* 81 Neb. 809, it was held that bequests to certain churches, the income to be used for certain purposes, created a charitable trust, and that the doctrine of charitable uses as administered by the courts of chancery in England was in force in this state, but in its application the courts can exercise judicial powers only. It was further held that the courts will view with favor donations by will for charitable purposes and will endeavor to carry them into effect where the same can be done consistently with the rules of law.

It is true that in these cases the question generally arose between the donor or his heirs and the donee, but the question of the existence of the trust is not affected by that circumstance, and the conclusion must be the same, however, the question is presented, as it depends upon the terms of the donation, the conditions attached thereto and the object or purpose for which it is made.

We are of the opinion that the donations made by the

Baptist Education Society and others to the endowment fund of Grand Island College constituted a charitable trust, regardless of the fact that they were made direct to the college; and that the college did not acquire absolute title to the principal of such fund but only to the income thereof. We are further of the opinion that it was the intention of the donors to establish a public charity of a character which is within the special favor and superintendence of a court of equity to preserve it and to secure its application in accordance with the conditions under which it was received.

A number of contributions to the college were made under different contracts, and they will now be considered. The Patterson prize fund was created by the conveyance of land to the college to sell the same and use the proceeds "for the purpose of creating a Patterson Declamatory Prize Fund." The lands were sold and a fund of $800 resulted. There was a provision in the gift that the proceeds become a part of the endowment fund of the college and for a reversion to the grantor in case the college should cease to operate for two years. Beyond. question this was a charitable gift to become void upon condition subsequent, upon the happening of which the fund would revert to the donor.

The "Victor Person memorial fund," so-called, is claimed to be a special endowment established by Victor's father as a memorial, but the evidence does not establish any contract or conditions to support this contention. We think, however, that a stipulation between the parties to the effect that this donation was made to the endowment fund is broad enough to bring it within the class of charitable trust. The I. W. Carpenter donation is also within the terms of the stipulation.

The "Library Fund" was created as follows: It appears that certain securities were set aside by the college trustees and placed in the control of the endowment treasurer for the maintenance of the library, but the evidence entirely fails to establish any gift or donation for

such purpose. We are, therefore, constrained to hold that the securities in this fund do not constitute a trust.

The "Philip Kinney Memorial," $500 in cash, was received by the college from the pastor of some church in Nebraska and was to be designated as the Philip Kinney Memorial. While the evidence upon this subject is far from satisfactory, we are of the opinion that this fund calls for protection as a charitable trust. .

The John R. Webster fund, $5,000. This fund was initiated May 14, 1901, by a gift of $1,000 to "be held by said college forever, as a trust fund to be known as the 'Webster Scholarship' and no part of the principal of said sum shall ever be expended for any purpose whatever." The contract also provided that, if for any reason the college became incapable of administering the trust, the fund should be transferred to its successors or some other institution of learning to be selected by its trustees. The remainder of the fund is alleged in the petition to have been given to the college by Mr. Webster for several special purposes, and that "thereafter by consent of and with the agreement of said donor the said college duly passed a resolution that all of said fund of said $5,000 should be preserved intact and known as the John R. Webster endowment fund." We know of no rule whereby the college could set aside a portion of its general assets, call it an endowment fund and thus create a charitable trust. We therefore conclude that to the extent of $1,000 the Webster fund is a part of the endowment, but the remainder is a part of the general assets of the college.

The "Mildred E. Person Memorial" note, "Warren Scholarship" note, Alice J. Roessler note, and Gertrude Martin note appear to be a part of the endowment fund, although none of them have been paid.

The "Lauretta J. Schreiner Annuity," so-called, arose in the following manner: In 1919 certain lands were conveyed to the college to be sold and the proceeds placed in the hands of the Equitable Trust Company of Omaha "for investment as a part of inchoate endowment fund of said

college, and shall be perpetually held as a part of the endowment fund of said college and shall be known as the Lauretta J. Schreiner endowment fund." In consideration of such conveyance the college agreed to pay Lauretta J. Schreiner the sum of $33,600 in quarterly instalments of $420 each. Subsequently, the Equitable Trust Company having gone out of business and there being about $35,000 in the fund, by the consent of the college and Schreiner, the fund was turned over to the college subject to the payment of the annuity. The contract further provided that after the maturity of the annuity April 1, 1939, any balance remaining in the fund should be "applied toward the maintenance of a chair of English Bible in said Grand Island College and shall never be used for any other purpose." Still later an agreement was entered into whereby all of the securities in the fund in excess of $15,000 should be released to the college for the purpose of collateral security for a loan, and the $15,-000 was turned over to the Stephen's National Bank of Fremont as trustee to secure the payment of the annuity, the college engaging to restore to the fund the securities borrowed. The annuity has been kept up to date, but the securities are still held as collateral. We think it was the intention of the parties to create a charitable trust by the establishment of this fund and the same should be protected to the extent of $15,000, and any surplus arising from sale of the collateral to be applied as directed.

The A. D. Turnbull, Minnie A. Tavender, Jefferson D. Yelton, Frank J. Pierce and Eva H. Coon donations were shown by the evidence to have been contributed under contracts which did not provide that they should be a part of the endowment fund, but the petition alleges that they were so contributed and the stipulation above referred to seems to admit that fact and they have always been so considered. The terms of the stipulation are: "That contributions have been made to Grand Island College and to its endowment fund, as alleged in paragraph 10 of the plaintiffs' petition with provision for the pay-

ment to the donors of annuities substantially as alleged in paragraph 10," which included those mentioned. While counsel for the creditors did not join in this stipulation in its entirety, the only evidence they required was, where "these special donations were given by will or written instrument that those ought to be offered in evidence so that the whole instrument will appear," which was done. Under these conditions we think the stipulation was complied with, and that the fact that the contributions were made to the endowment fund must be deemed established.

Claim of Grand Island College to reimburse the endowment fund the sum of $26,726.41 which it withdrew from said fund many years ago with which to build a girls' dormitory. This cannot be allowed. When these funds were withdrawn they were converted into property which cannot be separated from the general assets of the college to the prejudice of creditors. The same is true of quite a number of other misapplications of the fund. If there is any remedy for these acts it lies with the successor in trust or the donors against the college trustees.

We hold that the following funds and property held by Grand Island College trustees constitute a charitable trust and are not subject to the claims of creditors:

(1) The securities listed in exhibit 3 at page 86 of the bill of exceptions to the amount of $46,900; excluding only claim of the college to one-half of the mechanic's lien of Grand Island Plumbing Company. The item of $5,500 in this list, which is disallowed as part of the fund, is a claim by the college on account of payment of one-half of the mechanic's lien of the Grand Island Plumbing Company. This payment was enabled to be made through payment of the Gibson loan which was a part of the endowment fund, but the evidence does not identify it with any particular gift to that fund. Our attention has not been called to any rule of law which would authorize this court to withdraw from the general assets a sum to reimburse the endowment fund under these circumstances, and as between the creditors and the college, the former

have the stronger equity. (2) All real estate to which the college holds legal or equitable title as the result of the foreclosure of mortgages which formed a part of the endowment fund of the college. (3) The securities in the Weaver fund, now in custody of United States National Bank as executor and trustee. (4) The Philip Kinney Memorial fund $500. (5) John R. Webster scholarship fund $1,000. (6) The notes of Mildred E. Person, .$2,500; George E. Warren, $2,000; Alice J. Roessler, $100; estate of Gertrude Martin, $500. (7) Patterson prize fund $800. (8) The A. D. Turnbull, Minnie A. Tavender, Jefferson D. Yelton, Frank J. Pierce and Eva H. Coon donations. (9) Lauretta J. Schreiner annuity to the extent of $15,000 and any surplus remaining after payment of the notes for which securities were pledged as collateral security. (10) James H. Davis donation $300. (11) Friend Baptist Church donation $500. (12) Victor Person memorial fund $2,000. (13) Mildred E. Person endowment fund $2,500 note. (14) George E. Warren scholarship fund $2,000 note. (15) The I. W. Carpenter lands.

With reference to the following items we hold that the evidence is insufficient to establish a trust and the securities held in connection with any of them are not held as a part of the endowment fund but belong to the general assets: C. M. Strong, Library fund, $4,000; Y. W. C. A. fund, $87.80; Missionary school fund, $51.33; R. M. Proudfit, $800; Grand Island College claim for $26,726.41 borrowed from endowment fund for the erection of buildings.

We will now briefly discuss the powers of a court of equity with reference to this charitable trust, the existence of which has been established. As has been heretofore stated, the common-law doctrine of *cy pres* and the statute 43 Elizabeth are not in force in this state, and the courts are restricted to the exercise of judicial powers only. Charitable trusts, however, were administered by courts of chancery of England exercising their inherent judicial powers anterior to and independent of the statute 43 Elizabeth. *Vidal v. Girard's Executors,* 2 How. (U. S.)

127. And by the Constitution of this state courts of equity are invested with all the jurisdiction of the chancery courts of England as it existed at the time of the separation from that country, including the doctrine of charitable uses. *In re Estate of Nilson,* 81 Neb. 809. The power thus exercised is purely judicial. Equity does not itself administer the trust, but acts through trustees appointed by the donor, or, in case of failure thereof, will appoint a trustee. The exercise of this power over charitable trusts has been attributed to what has been termed the judicial *cy pres* doctrine. *Richards v. Wilson,* 185 Ind. 335, 386; *In re Estate of Nilson,* 81 Neb. 809, 817, citing *Crerar v. Williams,* 145 Ill. 625. This judicial power will not be exercised to the full extent of the prerogative power; that is, to devote the fund to a different purpose than the donor intended but one as near like it as possible; but, it will be exercised to preserve the fund if possible and devote it to the general charitable purpose of the donor. Charitable trusts "are construed so as to give them effect if possible, and to carry out the general intention of the donor, when clearly manifest, even if the particular form and manner pointed out by him cannot be followed. * * * So the principles of construction applied to public charities evolved the judicial *cy pres* doctrine, and under its application in circumstances like those here, the courts are required to look beyond the institution, or trustee, particularly designated to administer the property given and the particular manner in which it is to be administered, to those for whose benefit it is to be administered. And if it appears that the latter were the real objects of the donor's bounty, the trust will survive the failure of the particular trustee and the particular method of administering the trust if the court can secure a trustee to carry into effect as near as may be the dominant purpose of the donor. And so in many cases it has been held that, notwithstanding the corporation to which the gift was to go and by whom it was to be administered was not incorporated, or would not or

could not administer the trust, nevertheless, the trust did not fail, but only the machinery for carrying it into effect, and that in such cases the court would supply not only the trustee but devise a mode of administration akin to that intended." *Richards v. Wilson,* 185 Ind. 335, 393, 394, citing cases from numerous jurisdictions. We will not extend this opinion further upon the *cy pres* doctrine, as we are of opinion that recourse thereto is not required for the disposition of the case, which can be accomplished by the exercise of the ordinary and conceded judicial powers of the court.

The Grand Island College has entered into a contract with Sioux Falls College of Sioux Falls, South Dakota, whereby it seeks to transfer to the latter the endowment funds, and any surplus, after paying its debts, of all its property. Can it lawfully do this, and has the court the power to approve and authorize such a transaction? The Sioux Falls College is of the same general character as the Grand Island College. It is under the sponsorship of the same Baptist denomination, and control of the Northern Baptist Convention. It has agreed to accept the fund subject to all the conditions of the donors, as to memorials, special funds and annuities, and to administer the trust accordingly. The Northern Baptist Convention, the principal and all known donors consent to the transfer. There is no other institution prepared to take over the execution of the trust.

It is entirely probable that, unless the trust can be executed, the funds would revert to the donors (*People v. Braucher,* 258 Ill. 604; *Miller v. Riddle,* 227 Ill. 53) by far the greater number of whom are unknown. The fact that all known donors have consented to the transfer, though not controlling, is a matter to be given great weight. It is for the purpose of carrying out the benevolent intentions of the donors that the intervention of a court of equity is invoked.

It is insisted by the creditors that one of the conditions of the gifts to the endowment fund was that the college

be maintained at Grand Island. We cannot agree. We think the dominating intention of the donors was much broader, and was the creation of a charitable trust for educational purposes, and that the location of the college was a matter of description or identification. However, the creditors are not in a position to raise the question in view of our holding.

A transfer such as is proposed was approved in *Lupton v. Leander Clark College*, 194 Ia. 1008, and *Starr v. Morningside College*, 186 Ia. 790. We see no legal or other objection to the proposed transfer. If it were set aside, it would be the duty of the court to appoint a trustee to administer the trust, and whom could it appoint? If not the appellant, there being no other party willing to undertake it so far as the evidence in this case shows, it would be necessary to distribute the fund to the donors *pro rata*, which is a practical impossibility; or, it is probable, in view of the consents filed by the donors, if distribution could be made, the fund would eventually find its final resting place with the Sioux Falls College. Why require such circumlocution when the same result may be accomplished directly in the manner proposed? By approving the transfer the court merely confirms the selection of a new trustee, one of its conceded judicial powers in this class of cases, and secures the application of the fund to the uses and purposes intended by the donors. We therefore hold that the contract is *intra vires* of the Grand Island College, approve the same and direct that it be carried out.

A number of other matters presented by the record will now be considered. First, whether the property of the college, other than the endowment funds, is liable for the debts of the college. There is no real contest here. The agreement of the two colleges provides for the sale of all property of Grand Island College for payment of creditors, excepting only such portion thereof as may be determined not liable therefor. It seems well settled that where donations are made for the general purpose of

carrying on a business of any kind, though in the form of a trust, the absolute control of the *res* being bestowed upon the donee, the property is liable for debts incurred for the purpose intended. *Woddrop v. Weed,* 154 Pa. St. 307; *Norton v. Phelps,* 54 Miss. 467; *McLeod v. Central' Normal School,* 152 Pa. St. 575. Section 24-701, Comp. St. 1929, providing for the incorporation of educational institutions, provides that they "may hold all kinds of estate, real, personal, or mixed, which they may acquire by purchase, donation, devise, or otherwise, necessary to accomplish the objects of the corporation, and the same to dispose of and convey at pleasure." Of course, the disposition of the property must be one in conformity with the purposes for which it is held; but debts incurred in carrying out such purposes are for the benefit of the corporation, and fully within its powers to contract, which carries an obligation to pay.

We have not overlooked the provision of the charter of the college that "The Board of Trustees shall never in any manner sell, convey, alien or mortgage, or in any manner pledge the campus and college buildings or the premises whereon the same may be situated." But by a previous article the trustees were given "full power and authority to carry into effect the purposes of this incorporation," which were the establishment and maintenance of a college. It must have been within the contemplation of the incorporators that debts would be incurred in the accomplishment of such purposes, and that liability for payment thereof is not within the terms or spirit of the above prohibition.

It was held in *Ray County Savings Bank v. Cramer,* 54 Mo. App. 587, that a college building erected and maintained by a religious society may be subjected to a mechanic's lien. A distinction must be taken between a private and a public corporation, a private and a public charity. Schools and other institutions owned and operated by the state are not subject to such lien. Much reliance is placed upon *Horton v. Tabitha Home,* 95 Neb.

491. Defendant was organized for charitable religious purposes to provide a home for aged persons and orphans, a "general charity." It was held to be a religious society and could not subject its property to a mechanic's lien without permission of the district court of the proper county, under a statute to that effect. It was further held that the contract under which the improvements were made was *ultra vires* the purposes of the corporation, and moreover was not made with the board of trustees thereof. We think that case is not controlling here by reason of the difference in the nature of the charity. It cannot be claimed that the Grand Island College is a religious society conducting a general charity; but a private corporation for the education of the young. In the *Tabitha Home* case stress is laid upon the fact that contracts upon proper consideration had been made by aged persons for care during their lives, and for orphans during minority, which would become public charges should the charity fail. These features are not present in the instant case.

The distinction between the general college property and the endowment fund is that the former was given to the college unconditionally for the purpose of building and maintaining a school, while the latter was upon condition that only the income should be used. We conclude that the college property was subject to the mechanic's lien and claims of creditors.

It is argued that by reason of the unauthorized use by the trustees of part of the endowment fund for buildings, expenses and as collateral, they are estopped from claiming that such fund is a charitable trust. However this may be as to the funds wrongfully appropriated, the trustees could not by such action destroy the trust as to the remainder of the fund.

An attempted levy of execution was made upon some of the securities constituting a part of the endowment fund, contained in a safety deposit box. This was ineffectual, as no possession of the securities was retained by the officer, but the same were returned to the en-

dowment treasurer and no receipt taken therefor.

By the decree of the district court the attorneys for the trustees were allowed a fee of $500 payable out of the endowment funds. It is claimed this was not warranted. The trustees were in possession of the endowment funds and matters had proceeded so far that some of the creditors had attempted to levy upon them to collect their judgments. The trustees were in doubt as to their duty with reference to the fund, and we think the application to the court for instructions was eminently proper. The general rule is stated as follows: "Where the duty of a trustee is a matter of doubt, it is his right to ask and receive the aid and direction of a court of equity in the execution of his trust. In such cases, if reasonable grounds exist for coming into court to obtain the construction of the instrument creating the trust, the practice is to allow the costs and expenses, as it respects all the parties, and as between attorney and client, out of the trust funds." *Attorney General v. Moore's Executors,* 19 N. J. Eq. 503. No objection to this allowance is made except by a creditor, and in view of our holding that creditors have no claim upon the fund out of which the allowance is to be paid, the creditor is not in position to complain.

The question of the priorities between judgment creditors and those whose claims have not been reduced to judgment was reserved by the district court, and therefore cannot be determined by this court on appeal.

The creditors claim the right at all events to subject the income from the endowment fund to their debts, and suggest that the fund be placed in the hands of the receiver to so apply the income, though conceding such a procedure would be of little benefit. No doubt any accrued income in the hands of the trustees at the time the college closed, September 1, 1931, is subject to debts; but we think upon the happening of that event, the college being insolvent, the status of the endowment fund as an active instrumentality came to an end; the rights of the donors

or successors in trust became fixed, and the control of the court began. The interests of the donors, the successors in trust and the public require that the fund be restored to activity as promptly as may be.

The judgment of the district court is reversed and set aside and the court instructed to enter a decree in accordance with this opinion, establishing the endowment fund of Grand Island College as a charitable trust, approving and confirming the transfer of such fund to Sioux Falls College, to be held by it upon the same trusts and conditions as it was theretofore held by Grand Island College, establishing the mechanic's lien of Grand Island Plumbing Company as a first lien, and the various other matters determined hereby; that the receivers be directed to convert into cash all personal property and securities of the college not held in trust and after payment of costs, except attorney's fees allowed, distribute the same *pro rata* among the creditors; that the receivers dispose of the real estate of the college under direction of the court, the proceeds to be brought into court and disposed according to the rights of the parties to be determined by the court; that an attorneys' fee of $500 to plaintiffs' attorneys for services in the district court, and an additional fee of $500 for services in this court, which is hereby allowed, be taxed as costs to be paid out of the endowment fund.

REVERSED.

PAINE, J., dissenting.

Several statements made in the main opinion at once challenge the attention. First, it is stated therein that this action is brought by persons constituting the board of trustees of Grand Island College; but the petition names as plaintiffs some 20 individuals constituting the trustees of the endowment funds of said college,—a vital difference, as the facts disclose.

It is also stated that the endowment funds were kept separate from the general funds of the college. This over-

looks the fact that the testimony of the endowment treasurer during the last seven years, D. E. Magnusson, as found on page 311, is: "There has been nothing paid in the first instance to the endowment treasurer so far since I have been in office; I have received $5,000 from the Philip Kinney memorial and received in the form of a check of the treasurer of Grand Island College general funds in the Commercial Bank and turned over to me as endowment treasurer." On page 308 of the record the following testimony of Dr. George Sutherland appears: "By the Court: You are not sensing my question. I asked you to tell us whether or not that money that was received from donations and drives and the pledges, was received, was turned over to the endowment treasurer without any record being kept of the transactions and being copied in the books of the college. A. You will —yes, you will find the records in the minutes of the executive committee wherever their reports are made by those soliciting pledges and collecting money. By the Court: You are still not answering my question. Don't you know? A. I think that is all the books we had; there are no books."

It is stated in the main opinion that the decision of the district court for Hall county, rendered by Judges Clements and Horth, is generally against the plaintiffs. I find no such statement in the decree rendered by these two district judges, who have for many years been in touch locally with all the facts in the case. The important part of the prayer of the petition was for the judgment, advice, and direction of the court as to the administration of these funds. It would be strange indeed if the decree found generally against the plaintiffs, as stated in this main opinion, that the records of this court should show that the plaintiffs are the appellees in the case, and not appellants. The contest in this court is being waged, not by the plaintiffs, but by the three appellants, to wit, the board of education of the Northern Baptist Convention, a corporation organized under the laws of New York, and also the Sioux Falls University and Sioux Falls College,

which are seeking to absorb the remaining endowment funds of the Grand Island College. The longest argument in this court was made by C. C. Caldwell, an attorney of Sioux Falls, representing these appellants. The city of Grand Island, also an appellee, is a cross-appellant, objecting to the fee of $500 allowed to plaintiffs' attorney, and the Schreiners, annuitants, appellees, filed a motion for new trial on certain phases of the order relating to them. The trial court having found that the provision in the Schreiner annuity providing for the maintenance of a chair of English Bible in the Grand Island College, it was, therefore, only a direction or admonition to such college for the establishment of such chair. The decree further found that funds held under annuity contracts with Patterson, Pierce, Tavender, Turnbull, Yelton, and Coon were trusts, and the receivers in charge of the property were directed to strictly comply with the provisions in said annuity contracts until a settlement of the rights of the beneficiaries thereunder might be had. Hence, it is clear from the record that the plaintiffs are not the appellants, waging a contest in this court.

The evidence discloses that the first of the three non-resident corporations, to wit, the New York corporation, is naturally anxious to assist in founding a new Baptist institution, to be known as the Sioux Falls College, and readily consents, on behalf of its predecessor, the American Baptist Education Society, that all of the funds should be transferred to the new school in South Dakota, and the appellants have secured consents from several of the other larger givers that said funds can be moved intact to the new college to be established.

The main opinion is an interesting and scholarly discussion of the subject of charitable trusts by an experienced and able district judge of Omaha. It reviews, at considerable length, decisions from many states, including a number from Iowa. Little objection can be made to the opinion, except that many facts would be needed to sustain the findings if applied to this case, which facts I

confess I have been entirely unable to discover after a patient search of the records covering several days.

Would it not be well to review some of these basic facts? The articles of incorporation of the Grand Island College, adopted June 13, 1892, were signed by Honorable W. H. Thompson, and several others, and the minutes of the early meetings show that he was active during those years, but his name does not appear as a trustee in the later years.

The evidence discloses that the college ran from 1892 until September 1, 1931, on a campus consisting of about 30 acres; that it owns thereon an administration building, Hibbs Hall, a dormitory for girls, and a boys' dormitory, and an auditorium or gymnasium; that the campus has been carried upon the books of the college at a value of $30,000, and the buildings at a valuation of $249,500, but that the property is unmarketable; that the college was closed September 1, 1931, because it was unable to meet its current and necessary expenses, having become largely indebted to numerous creditors, and that it is unable to pay its indebtedness.

I cannot find that there was ever any authorization for any board of trustees of the endowment fund. On page 40, Judge Clements asked: "Was there any organization or corporation of the endowment fund?" Answer: "No further organization that I can find." Page 56: "By Mr. Mayer: The creditors do not join in the stipulation that the trustees of the Grand Island College were appointed trustees of the endowment fund belonging to the said Grand Island College. Our next objection is in regard to the creation of an endowment fund, that any such fund was ever created, and what went into it, and the creditors do not join in the stipulation that an endowment fund was created, and kept separate and distinct from the other funds of Grand Island College."

During the 38 years of its existence, there was at all times an endowment treasurer. There was also, during a part of the time, a committee, consisting of five mem-

bers of the board of trustees of 21 of the Grand Island
College, which assisted the treasurer in handling and in-
vesting annuity and other special funds.

Many drives and campaigns were put on during the
years of the college's existence for the purpose and with
the sincere hope that a large endowment fund could be
created, but these hopes were never realized, for during
the entire 38 years the total sum of about $85,000 was
actually collected for said purpose. These funds were
usually paid to the secretary or treasurer, or often to
the president, and paid over by such officers to the so-
called endowment treasurer, but such funds were always
under the sole and exclusive control of the board of
trustees of the college, and orders that they made in their
meetings were always the orders that determined what
should be done with the funds. In the building of Hibbs
Hall, the girls' dormitory, funds of approximately $26,000
were ordered by the board of trustees to be taken out of
the endowment funds and used for the purpose of erect-
ing this building. Toward the end of the existence of the
college, it is testified that some $4,000 of such funds were
used in the payment of the long past due salaries of the
faithful teachers, and recently another sum of $5,388.56
was directed to be paid to the Grand Island Plumbing
Company on its contract for rebuilding the heating plant.
Not only were these sums taken out of the various en-
dowment funds and used for running expenses and pay-
ment of other items, but in times of stress, when it was
impossible to raise money at the moment, it is shown
by the minutes in the record that endowment funds were
frequently, during the years, put up as collateral at banks
for the purpose of borrowing money to meet the salaries
of teachers and other running expenses. A. B. Newell,
the endowment treasurer for two years, testified, in
answer to interrogatory 751: "I resigned for the reason
that President Wells wanted to take some funds to put
up as collateral at the bank and I wouldn't stand for it."
Such use of these funds was so usual and customary that

a treasurer who would not consent thereto had the only alternative of resigning. It is also shown clearly by the evidence that practically all of such funds were payable to the Grand Island College, the only corporate entity by which such funds could legally be held. When a real estate mortgage held on such funds became delinquent, action of the board of trustees of the college directed a foreclosure suit, and when the property was bid in the title was taken in the name of the Grand Island College, not in the name of an endowment fund. It is also worthy of note that there was never at any time any definite name given to such funds.

If there was a legal entity known as an "Endowment Fund," it would so appear in the record. But a casual search of the bill of exceptions and exhibits discloses the following terms by which endowment funds of the Grand Island College were known and styled: Unclassified General Endowment, Webster General Endowment, Permanent Endowment Fund, Strong Missionary Scholarship, Library Fund, Philip Kinney Memorial, Permanent Fund Assets, General Endowment Fund, Special Endowment Funds, Patterson Prize Fund, Victor Person Memorial, Warren Scholarship Fund, Ministerial Scholarship Fund, Y. M. C. A. Endowment Gift, Productive Endowment, and the Coon and several other annuities.

Do these appellations not appear to one as simply different ledger accounts in the ledger funds of the Grand Island College? Each was kept separate in a manner which would allow a report to be made to the donor, but such funds were always legally the property of the Grand Island College, and of no other corporation.

It was finally stipulated between the parties that there was no organization or incorporation of the endowment fund in accordance with section 24-712, Comp. St. 1929, which was the law of our state during all of the time of the existence of the college.

Article 10 of the charter provides that the board of trustees shall have full power and authority to carry into

effect the purposes of this incorporation; shall have the general care and disposal of the funds and property of the corporation for the benefit of the college, and may use and invest said property and funds in such a way and manner as may to them seem most effective, subject, however, to the laws of this state and the conditions and purposes of special endowments, bequests and donations. In the articles of incorporation I fail to see any mention made of an endowment fund, or endowment treasurer, or endowment committee, but article 8 says the board of trustees shall have power to elect a president, professors, tutors, and teachers, and such other agents and officers as may be deemed advisable, and to fix the compensation of each, and to remove the same at pleasure.

The records are filled with the aims, hopes, and plans for absorbing the funds of this bankrupt institution into the new college to be organized in South Dakota; may we not, in fairness to the appellees, examine their claims for a moment?

Exhibit 48 is the audit from May 1, 1931, to October 31, 1931, of the college, at which time the accounts payable had reached the sum of $24,126.16. Among the larger items making up this total, as shown by schedule 4 of the said exhibit, were the following accounts of coal, repairs, and supplies to keep said college in operation: American Beet Sugar Co., $1,047.94; Augustine Company, $966.39; City Electric Dep't, $861.23; Chicago Lumber Co., $4,354.70; Goehring-Sothman Co., $1,305.37; Grand Island Plumbing Co., $5,277.11; Independent Publishing Co., $1,639.83; Lowe & Campbell, $762.51; miscellaneous, $7,911.08; total, $24,126.16.

Schedule 3 of the same exhibit gives the list of notes payable, among which we find: Commercial Bank, $10,-885; Grand Island Nat. Bank, $3,000; Chapman State Bank, $2,000; The Augustine Co., $2,942.69; Nebraska Loan & Trust Co., $5,000; Fidelity Nat. Bank & Trust Co., $1,881.25; George Sutherland, $531.20; miscellaneous, $1,125.57; total, $27,365.71. Then comes in schedule

3 the notes which have been given by the Grand Island College for salaries to teachers and other employees, among which are listed: Sabra Abbott, $392.65; Harriet Anderson, $1,196.66; Ella Blunk, $60; G. Robert Coatney, $136.50; Carolyn B. Cowell, $672; Mary B. Fox, $300; C. S. Griffin, $1,132; Margaret Gelatt, $136.50; Bennett Hites, $754.84; J. D. Jackson, $1,317; W. A. Karraker, $797.40; W. A. Knox, $1,399.57; Alice Lindburg, $730; W. T. McDonald, $1,490.80; Harriet Norris, $57; J. H. Pollard, $1,480; A. C. Rice, $2,202.50; Lawrence Ritchie, $678.89; Mrs. F. A. Rush, $387.50; Laurene Steven, $828; George Sutherland, $140; F. J. Titt, $1,433.58; miscellaneous, $5,880.40; giving a total of $23,603.79, or a grand total of the notes payable outstanding, $50,969.50, and adding the accounts payable of $24,126.16 gives us $75,095.66. In order to avoid the unnecessary costs of a multiplicity of suits, practically all of these accounts and bills payable were assigned to several attorneys for more expeditious handling.

It is stated in the main opinion that upon May 6, 1931, the Grand Island College entered into a written contract with Sioux Falls University, of Sioux Falls, South Dakota, to consolidate said colleges. I fail to find any evidence supporting this statement. It only appears that two officers of the college, the vice-president and the secretary, entered into such agreement, and I can find no evidence of any action of the board of trustees of the Grand Island College, taken as required by the articles of incorporation, approving said contract. Article 2 of the charter provides that its principal office and place of business shall be forever kept and maintained at Grand Island, Nebraska. Article 4 provides that the management of this corporation shall be vested in a board of 21 trustees, five of whom shall be resident freeholders of Hall county, Nebraska.

It is clear that the attempted purported contract, entered into by the vice-president and secretary of the board of trustees of the Grand Island College with the Sioux

Falls University, is void, as it is clearly in violation of the provisions of the articles of incorporation of the Grand Island College. Yet the main opinion finds that, in spite of these undisputed facts, the contract with the South Dakota college merely selects a new trustee to handle these funds, and approves the contract simply signed by two officers, with no required corporate action upon which to base their authority.

Let us examine a few of the authorities. *Horton v. Tabitha Home*, 102 Neb. 677. The first opinion in this case is found in 95 Neb. 491. It holds that where a charitable institution has received substantial benefits from improvements made on its property, but is not liable for the cost because the main object was not within the powers and purposes of the institution, the court will order any funds so raised to the payment of the costs. To the decision in 95 Neb. 491, Judge Letton dissented. The hospital erected was not successful, and an attempt was made to foreclose a mechanic's lien, and the majority of the court held that no such lien could be asserted against a charitable institution. Judge Letton dissenting to the decision in 102 Neb. 677, says: "The great weight of authority is to the contrary." See annotation, Ann. Cas. 1915D, 1145, and 51 L. R. A. n. s. 161. Judge Letton says further: "It has always been my opinion that the materialmen were entitled to the liens they asserted. Most certainly, if not entitled to liens, they should be entitled to a judgment against the corporation for the price of the articles supplied. To hold otherwise is to permit a corporation organized for charitable purposes to use charity as a sword, and not as a shield, and to obtain property of others without paying for it, which is repugnant to every legal and moral principle. Charity is said to cover a multitude of sins. In this case it is used to cover the wrongful deprivation of these merchants of their property without compensation."

It has been held that, where property is donated to a charitable corporation, although donor adds that it is to

be used for certain purposes, when those purposes are among those for which the charity was incorporated, no trust is created, for one cannot be a trustee and a beneficiary at the same time. *Woman's Foreign Missionary Society v. Mitchell,* 93 Md. 199.

. In *Lyons v. Planters Loan & Savings Bank,* 86 Ga. 485, 12 L. R. A. 155, it is said: "If any class of debtors ought to pay, as matter of moral as well as legal duty, the good people of a Christian church are that class. No church can have any higher obligation resting upon it than that of being just. * * * The law grants exemptions of property to families, but none to private corporations or collective bodies, lay or ecclesiastical. These must pay their debts if they can. All their property legal and equitable is subject."

*Presbyterian Congregation of Erie v. Colt's Executors,* 2 Grant's Cases (Pa.) 75: "The power given to religious societies to hold land was not intended to prevent them from selling it nor to enable them to hold it against their creditors, but to hold and sell it as individuals could do, always subject to the claims of creditors. * * * It may well be questioned whether it would be for the public benefit to allow them to disregard their contracts."

A gift to a corporation conditioned upon a use for which said corporation is incorporated makes such gift absolute, and not a trust. In *Greene v. Greene,* 125 N. Y. 506, 21 Am. St. Rep. 743, it is held that there are three essential elements of every express trust, viz., a trustee, an estate, and a beneficiary, and that the trustee and beneficiary must be distinct personalities, or otherwise there could be no trust, and the merger of interests in the same person would effect a legal estate in him.

Cases could be cited by the page in support of these contentions, but our supreme court, in the case of *Clarke v. Sisters of Society of the Holy Child Jesus,* 82 Neb. 85, in the first syllabus, said: "It is a general rule that, where property is conveyed directly to a corporation to hold for use in the purpose for which the corporation

was created, no trust for the benefit of others arises, even though the conveyance contains a condition directing the use of the property in a certain manner from which third parties may be benefited. One cannot be a trustee of property and a beneficiary at the same time." This holding of our court has never been modified in any way, and the facts in the case at bar clearly bring it within the law announced, and even though the Iowa courts may have held contrary to this holding, we are required to follow our own decisions.

It is further stated in the main opinion that nearly all of the contributors to the endowment special funds and annuities have joined in the prayer of the petition and filed consent. The evidence discloses, on the contrary, that hundreds of charitably inclined citizens of Grand Island, of the state of Nebraska, and a very few outside, have down through the years contributed in the frequent drives and campaigns for endowment and other funds put on by said college during its 38 years of existence, and that not to exceed a half dozen out of these many donors have consented to this, as stated in the main decision.

E. W. Augustine, H. G. Wellensiek and Herbert F. Mayer were appointed receivers by the district court at Grand Island to take charge of all the property of the Grand Island College, and were directed by the trial court to sell the property and pay the costs, then pay the claims in judgment of the Grand Island Plumbing Company and the Chicago Lumber Company, and pay the balance remaining *pro rata* to the creditors of the college in such amounts and at such times as may be ordered by the court. Such an order, after carefully providing funds to carry out all annuity contracts, is just and equitable to these creditors.

Even if we should admit that the main opinion is right, yet justice and equity demand that all income from said funds be paid to these creditors up to the time that the funds should be turned over to the South Dakota college,

but even this crumb of comfort is denied them by the main opinion, which says that only accrued income up to the date September 1, 1931, could be applied on these debts on which date it says the status of the endowment fund as an active instrumentality came to an end. With this statement I entirely disagree. While the college became bankrupt and ceased to run, yet these funds still belong to the Grand Island College, and the public interest requires that they be applied to the payment of the debts incurred by creditors who furnished materials or labor, or worked as members of the teaching staff, during the last few years of the college's existence. It certainly would not be in the hearts and minds of the charitable Christian people who donated these funds that such creditors, whose labor and materials kept the college alive, as the donors wished, should now get nothing, and the funds be transferred to establish a new college in South Dakota, of which college only a few of the donors have ever heard.

It is evident that all alleged endowment funds were donated to the Grand Island College and are the property of such college; that, aside from the special annuity contracts, the creditors of said college are entitled to reach said funds for the payment of teachers' salaries, coal bills, plumbing bills, and other items, without which the college could not have functioned during the past few years. Such claims have all been found to be valid, and several of them have been reduced to judgment. If the main opinion in this case is carried out and the land is sold at present prices, it is doubtful if it will bring enough to pay the judgment creditors, and nothing whatever would be left to pay the claims of teachers and all of the other creditors.

In the main opinion these creditors are denied even the right to have the endowment funds held by the receivers of the court until the income therefrom would pay the debts of the creditors outstanding. There is a maxim that a debtor must be just before he can be generous; that he

must pay his creditors before he can transfer his property as a donation to a volunteer. This seems to have been ignored in this main opinion, to which I most respectfully dissent.