TOWN OF CODY, WYOMING, a Municipal Corporation, and SCHOOL DISTRICT No. 6, of Park County, Wyoming, a Public Corporation,

*Plaintiffs and Respondents,*

vs.

BUFFALO BILL MEMORIAL ASSOCIATION, a Corporation, W. A. KEPFORD and S. N. LANDGREN,

*Defendants and Appellants,*

Mary Jester Allen, Hiram S. Cody, Francis A. Cody, Harry B. Cody, Individually and as Trustees for the Cody Family Memorial Board, Robert D. Dripps, the State of Wyoming, Mary Cody Bartholomew, of Vernon, New York, the Unknown Heirs-at-law and Devisees of Francis A. Cody, Harry B. Cody, and Robert D. Dripps, if deceased,

*Defendants.*

(No. 2394; August 3rd, 1948; 196 Pac. (2d) 369)

472

For the Defendants and Appellants, the cause was submitted upon the brief of Kerper and Kerper, and Goppert and Housel, all of Cody, Wyoming, and oral argument by Mr. Jerry Housel and Mr. E. J. Goppert.

For the Plaintiffs and Respondents, the cause was submitted upon the brief of Littleton and Stedman, Meyer Rankin, and William J. Garlow, all of Cody, Wyoming, and oral argument by Mr. Martin W. Littleton.

474

476

478

480

## OPINION

BLUME, Justice.

William F. Cody, commonly known as Buffalo Bill, whose colorful career is still remembered by millions of people, ended his earthly career and was gathered to his fathers on January 10, 1917. For many years, he had his legal residence in Park County, Wyoming, where he had a ranch. The town of Cody was named after him. Almost immediately after his demise, a movement was set on foot to commemorate his life. On February 19, 1917, the legislature of the state made an appropriation of $5,000 to be used in connection with other contributions for the purpose of erecting a memorial statute of the deceased. Ch. 94, S. L. 1917. On March 1, 1917, citizens of the town of Cody organized a corporation under the name of Buffalo Bill Memorial Association, as a charitable corporation under the laws of this state. Contributions to commemorate the life of the deceased were received from citizens of Cody and others, including large contributions from Cornelius Vanderbilt, Rodman Wanamaker and others. Some of the relatives of the deceased contributed land, and the corporation acquired about 55 acres in or adjoining the town of Cody. An equestrian statute was erected on part of the land, standing on a plinth or mound, the latter costing the sum of $35,000. The statue was dedicated on July 4, 1924. A museum was erected on part of the land at the cost, before it was opened, of the sum of $22,000. Plans were made for the erection of many other buildings of an educational and recreational nature. In order to defray the expenses of keeping up the museum, an admission charge was made of the sum

of twenty-five cents. The town of Cody is located about 50 miles east of the eastern entrance of the Yellowstone National Park. A great amount of travel of people from all over the nation passes that way. Many customers, accordingly, ordinarily enter the museum, netting an income sufficient to keep the property of the association in good condition and to pay its expenses. But World War II came along. Travel to Cody and the Yellowstone National Park ceased. The association, as a result, was unable to pay its expenses. It had borrowed the sum of $500, and it had no funds to repay it. Repairs were necessary to be made and property had to be kept up in a general way. The trustees of the corporation attempted to borrow money from banks and from other sources, but were unable to do so. They finally turned to the Town of Cody as a party interested in keeping up the property as much as the corporation itself. As a result, the property was all conveyed to the Town of Cody. There is no doubt that some of the directors (trustees), in any event, considered this conveyance merely as a temporary expedient to secure the town for whatever money it should expend on the property and expected it to be reconveyed to the association after the war. When travel recommenced after the ending of the war, the town, according to the evidence, recovered, by reason of the admission fees to the museum, sufficient money to repay the amounts which it had advanced. Sometime in 1946, the association demanded a reconveyance of its property. The Town of Cody refused. In consequence of the demand, this action was brought to quiet the title to the property. The plaintiffs are the Town of Cody and School District No. 6 of Park County, Wyoming, to which the town had dedicated part of the property in controversy for athletic purposes. The trial court entered judgment quieting title in the plaintiffs, and the Buffalo Bill Memorial Association, and

the president and secretary of that association have appealed from that judgment to this court.

The defendants in the case are the Buffalo Bill Memorial Association and the president and secretary thereof. They are the appellants in this case. Other defendants were the grantors in some of the deeds which had been executed to the Buffalo Bill Memorial Association and their unknown heirs. These parties did not appear in the case and defaulted. Mary Cody Bartholomew, defendant, filed a disclaimer. The State of Wyoming also was made a party, and the Attorney General appeared on behalf of the State, disclaiming any interest in the property. The Buffalo Bill Memorial Association and the president and secretary thereof filed separate answers in the case. The substance of these answers is that the conveyances were in the nature of mortgages; that the association had no power to convey the property in question to the Town of Cody, and that the Town had no power to accept the conveyance made to it. They also filed a cross-petition asking for a reconveyance of the property to the association. They claim the value of the property to be the sum of $250,000.

As heretofore stated, the Buffalo Bill Memorial Association, sometimes hereinafter called the association, was organized under the laws of the State as a charitable corporation on or about the first day of March, 1917. It was organized to exist in perpetuity. The number of directors (trustees) were to be nine. The corporation has no capital stock. The Certificate of Incorporation provides for the following:

"a. The objects and purposes for which this corporation and association is formed, is to establish and maintain a historical society for the preservation of the history and antiquities of the County, the Town of Cody, the County of Park and the State of Wyoming; to build, construct and maintain an historical monument or

memorial statue in honor of and to perpetuate the memory of our late lamented fellow townsman Hon. William F. Cody, (Buffalo Bill).

"b. To carry on as a part of the business of said Association and corporation the collection of funds and the disposition thereof for the general purpose of building, constructing and maintaining such historical monument or memorial statue at or near the Town of Cody, in the County of Park, in the State of Wyoming. "c. The trustees of this association and corporation shall have the power of appointing permanent trustees; to make by-laws for the purposes of carrying out the objects and purposes of the corporation; to receive money or property, both real and personal, by donation, gift or otherwise, from the State or other corporations or persons, and to expend the same only under the authority and direction of the trustees of the corporation and for the sole and exclusive purpose of constructing, building, and maintaining such historical monument or memorial statue as provided in paragraph 'a' hereof.

"d. The trustees of this association shall have the further power of purchasing, holding, and receiving by donation or otherwise, real and other property to carry out the erection and completion of said historical monument and memorial statue but in no way shall alienate the same without the consent of the legislature of the State of Wyoming."

The corporation adopted by-laws. They provided that the active membership of the association should be identical with the membership of the Cody Club, and that anyone contributing $25.00 to the association should be entitled to honorary membership. The directors were to be chosen at the annual meeting of the association. Article III of the by-laws provides as follows:

"The Trustees of this Association shall have full power and authority to transact any and all the business of this Association, as set forth in its certificate of incorporation, and the power to appoint committees from their members or otherwise, for the purpose of carry-

ing on the business of the Association, to employ and compensate clerks or other assistants when they deem proper, and to do any and all lawful things for the purpose of said Association.

In other words, it seems that under the by-laws the members as above mentioned had no power except to choose the directors or trustees at the annual meeting, and all the other powers vested in the corporation seem to have been left in the hands of the directors or trustees of the association.

The corporation. acquired about 55 acres of land situated in or adjacent to the town of Cody. For convenience, it may be said that the acreage is divided into three different tracts. The museum of the association is located on Tract No. 1, being the northeasterly tract of the 55 acres hereinbefore mentioned, and the extent thereof is about 400 feet in length and about 300 feet in width. This tract of land was held by the Buffalo Bill Memorial Association under a deed executed by Hiram S. Cody, Francis A. Cody, Harry B. Cody, and Mary Jester Allen, individually and as trustees of the Cody Family Memorial Board. The deed reads in part as follows:

"The importance of Colonel William F. Cody's contribution, and the magnitude of his service, to his beloved country places a burden upon us who bear his name. In partial fulfilment of that duty placed upon us by our blood kinship to a great man, we hereby grant, bargain, sell and convey, in consideration of One Dollar and other valuable consideration, to the Buffalo Bill Memorial Association, Incorporated, for the purpose of a perpetual Memorial to Colonel William F. Cody (Buffalo Bill) the following described property:" (Here follows the description.)

"We feel that it is fitting and proper that those who are bound to him by ties of blood should continually work to promote this memorial. We, therefore, in a spirit of service, make it a condition of this grant, that,

perpetually, two members of the Cody family be members of the governing body of the Buffalo Bill Memorial Association, Incorporated. During their lifetime, Hiram S. Cody and Mary Jester Allen, or persons designated by them, shall be the members of said Board representing the Cody family.

"It is also made a condition of this grant that during her lifetime, Mary Jester Allen shall remain in charge of the Buffalo Bill Museum, and the relics and mementos placed therein."

Tract No. 2 is located immediately south of Tract No. 1, and has for many years been used as an athletic field by School District No. 6, supra, and was dedicated by the Town to the school district for that purpose. We are told that it is to be called the William F. Cody Memorial Field. The north half of this tract was deeded by the Lincoln Land Company to the Buffalo Bill Memorial Association without any conditions or reservations. The south half of the tract was conveyed to the association by Robert D. Dripps "in order to perpetuate the memory of Colonel William F. Cody." Tract No. 3, consisting of forty acres, is located west of the other tracts, and also was conveyed to the association by the conveyance of Robert D. Dripps above mentioned. The equestrian statue of William F. Cody is located on the northern boundary of this tract.

In 1938, it was deemed advisable by the authorities of the Town of Cody, as well as the Buffalo Bill Memorial Association, to take advantage of W. P. A. projects, and it was proposed to erect some buildings on the tract of land on which the museum above mentioned is located. It was apparently thought that advantage of that situation could not be taken by the Buffalo Bill Memorial Association as such, but the Town of Cody would be entitled to have such projects undertaken on its property. The association accordingly, on July 21, 1938, executed a quit-claim deed to the Town of Cody for part

of its real property—apparently the property on which the museum is located—and some buildings were constructed on that tract of land pursuant to such projects. The Town of Cody, however, never claimed the property conveyed pursuant to that quit-claim deed, although it never reconveyed the property to the association. After the commencement of World War II, the association fell into financial difficulties, as already stated, and borrowed the sum of $500. On May 21, 1943, all of the nine trustees of the association addressed a communication to the Town of Cody, reading as follows:

"Considerable discussion has heretofore been had concerning the matter of the Town taking over or acquiring the properties of the Buffalo Bill Memorial Association.

"In order to bring this matter to a head and to submit a definite proposition to the Council, we make the following offer:

"The Buffalo Bill Memorial Association will convey by warranty deed, subject to all the terms, covenants and conditions of what is commonly called the 'Cody Family Deed' and other deeds of conveyance and also subject to the assumption and payment by the Town of the outstanding indebtedness of the Museum in the amount of $500.00, to the Town of Cody, Wyoming all the real estate, including the Museum and the Buffalo Bill Monument, and will execute and deliver a bill of sale for all trophies, relics, etc. as owned by the Association and located in the Museum building and appurtenances. "If the Town should decide to take title to this property, we, the undersigned members of the Association, assure you of our cooperation and assistance in every possible way, and we will be pleased to discuss with you at your convenience the matter of policy, etc., our assistance, of course, to be only in an advisory capacity, or in such other respect as you might request."

On August 6, 1943, the town council of the Town of Cody accepted the foregoing offer.

On October 4, 1943, the Cody Club met, with about 200 members present. The minutes of the meeting of that club, in so far as pertinent here are: "The secretary read the minutes of last year's annual meeting. Mr. Walter Kepford reported on the status of the Buffalo Bill Museum and formally turned the building and grounds over to the Town of Cody." The minutes do not show that any motion to turn over the property to the Town of Cody was made or carried by the membership of the Cody Club. Immediately subsequent to the meeting of that club, a resolution was adopted, which purports to be by the members of the Buffalo Bill Memorial Association, to transfer the property to the Town of Cody. There were present, however, only four persons, all directors of the Buffalo Bill Memorial Association, whereas the by-laws of the association provide that a quorum of the membership of the association tion should consist of fifteen members. A part of the resolution adopted reads as follows:

"WHEREAS by reason of declining revenues of said Association due primarily to war conditions, and the inability of said Association to properly maintain, protect, insure and keep up the properties of said Association because of lack of funds, it is deemed for the best interests of said Association to transfer all of the properties, both real and personal of every nature and description as now owned by it, including the monument and statue of Buffalo Bill, to the said Town of Cody."

At the same time, the four members above mentioned who were present at the meeting also adopted a resolution which purported to be a resolution on the part of the board of directors of the association, and it provided for the transfer of the property of the association to the Town of Cody. On October 7, 1943, all of the real property of the Buffalo Bill Memorial Association was conveyed to the Town of Cody.

"Subject to all the terms, covenants and conditions of what is commonly called the 'Cody Family' deed, wherein Buffalo Bill Memorial Association is grantee, dated February 1st, 1935, and recorded in Book 82 at page 291 of the records of Park County, Wyoming, and all other deeds of conveyance and all other instruments relating to either the real or personal property hereinabove described or referred to, of record in the records of Park County, Wyoming, as of this date."

On the same day, the association, by its president and secretary, transferred to the Town of Cody "All pictures, mementos, trophies, relics, souvenirs, furniture, furnishings, fixtures, and all other personal property of every nature and description whatsoever and wheresoever situate, as now owned, possessed or controlled by the Buffalo Bill Memorial Association. On October 7, 1943, the Town of Cody, by its council, accepted the deed and bill of sale as above mentioned.

A good deal of testimony was introduced at the trial of the case by the appellants tending to show that the transfers above mentioned were made only for a temporary purpose, and to secure the Town of Cody for paying the indebtedness of the association and expenses which it might incur in keeping up the property while it was in its hands, but there was testimony that the town insisted upon transfers which were unconditional. In view of the fact that the trial court found in favor of the plaintiffs, we shall determine whether or not the transfers herein made to the Town of Cody are valid without reference to this testimony.

The appellants in this case insist that the transfers are invalid on account of the fact that only four persons were present at the meeting on October 4, 1943, when the above mentioned resolutions were adopted, whereas fifteen were required for a quorum of the members, and at least a majority of the board of directors for the adoption of the respective resolutions. We are

in doubt as to whether or not this contention is valid. The offer for transfer of the property to the Town of Cody was made by the unanimous vote of the trustees on May 21, 1943. That offer was accepted, and it is a question whether any further action on the part of the directors was necessary in order to carry out the contract, if lawful. And, since apparently no power in connection with the transfer of the property was vested in the membership itself, no resolution on the part of the members perhaps was necessary. So, we shall consider this case without reference to these contentions.

To establish and maintain a historical society for the preservation and antiquities of the county is recognized as a charitable use by Section 44-1001 W. C. S. 1945. So, too, it is said, "A gift for the erection of a monument dedicated to the education and elevation of the public, or as a memorial to a prominent citizen, is for a charitable purpose." 14 C. J. S. 443. And in Scott on Trusts, Vol. 3, Section 374.9, it is stated that while ordinarily the erection or maintenance of a tomb or monument is not a charitable trust, "there are cases, however, in which trusts for the erection or maintenance of tombs or monuments are held to be charitable trusts. Thus a trust to erect and maintain a monument to a person of note is a charitable trust, since it is considered of benefit to the community that such tributes be paid to its dead leaders." It is not necessary for us to determine whether or not William F. Cody comes within the classification as a person of note in view of the fact that the Legislature of this state appropriated the sum of $5,000 for the erection of a monument to him, thereby clearly recognizing him as such.

So we are seemingly confronted in this case with a charitable trust. A distinction, however, is sought to be drawn in 2 Restatement of the Law of Trusts between a charitable trust and the effect of a transfer to a

charitable corporation. It is said on Page 1093 that "where property is given to a charitable corporation, a charitable trust is not created." Again it is said on Page 1094 that in such case "the rules of law which are applicable are to a large extent those which are applicable to charitable trusts, since the ends to be served are the same." That leaves the field rather too open, and it must be determined in each case of a grant to a charitable corporation whether or not the rules relating to a charitable trust are applicable. No detailed statement as to when the distinction must be observed is given except that it is stated that a contractual debt of a charitable corporation may be enforced at law; that a contractual debt entered into by a trustee may be enforced in equity (Page 1242), and that the liability for certain torts may be enforced in equity (Page 1234). That subject is not involved in the case at bar and we need not discuss it. Professor Bogert, who was on the committee for the draft of the Restatement supra, in Vol. 2, Page 1032 of his work on Trusts and Trustees states that the distinction becomes important in those states which hold that a charitable trust is not valid, while a grant to a charitable corporation is. We are not troubled in that connection, since charitable trusts are recognized in this state. Professor Scott, who was the reporter of the Restatement supra, states, in his later work on Trusts, Section 348.1 that it is *probable* that no trust in the strict sense of the term is created by a grant to a charitable corporation. The Restatement has given rise to two lengthy discussions in periodicals, one by Thomas E. Blackwell in Vol. 24, pp. 1-45, Washington University Law Quarterly (1938), and one by Alexander Lincoln in Vol. 25, pp. 764-795, Virginia Law Review. Both of these authors give a review of the cases decided previously and they lean to the theory that such a grant creates a true trust. The author of the latter article states on Page 792 that "in

only three States does the doctrine that a gift to a charitable corporation for a corporate purpose cannot create a trust appear to have been consistently followed." That was in 1939. The theory back of the distinction above mentioned apparently is that to make a true trust, there must be a donor or grantor, a trustee and a cestui que trust; that the legal estate must be separated from the equitable estate by apt words, and when this is not done, there is a merger of the two estates, and the property is then held by. the corporation in trust for itself. See 14 C. J. S. 457; Doan vs. Vestry etc. 103 Md. 662, 64 Atl. 314, 7 L. R. A., N. S. 1119, 115 Am. St. R. 379; Danforth vs. Oshkosh, 119 Wis. 262, 97 N. W. 258; In Re Hargard's Estate, 59 S. D. 25, 238 N. W. 130 and cases cited. While that, in a sense, may be true, yet the very nature of a charitable corporation indicates that its property is intended to be administered for the benefit of others than the corporation itself. It is of its essence to do so for the benefit of the public or a part thereof.

If a corporation is capable of taking and holding property, it may be the trustees of a charity, the same as an individual, provided the trust is not inconsistent with, or repugnant to, the purposes of its organization. 14 C. J. S. 464; Restatement supra, Section 378. Grants made to a charitable corporation may, of course, be of various kinds. They may be absolute or, on the other hand, proper terms, conditions and directions may be annexed thereto. In the latter case, the terms, conditions and directions annexed must be carried out. If the grants are absolute, and no purpose is expressed for which they are made, the property may be used in such manner as those in control deem best for the accomplishment of the corporate purposes, and these purposes are determined by the charter and the statutes relating thereto. American Rescue League vs.

Assessors, 310 Mass. 330, 37 N. E. 2d 1019, 138 A. L. R. 110; McNelly vs. First Presbyterian Church, 243 Mass. 331, 137 N. E. 691. In such case, there is a presumption that the grants were intended for charitable uses, and an implied trust, enforceable in the courts, arises that they shall be so used. Lawson's Estate, 264 Pa. 77, 107 Atl. 376; Baughan's Estate, 281 Pa. 23, 126 Atl. 58, 25 Va. Law Rev. 789; American Bible Society vs. American Trust Society, 62 N. J. Equ. 219, 50 Atl. 67; Jordan vs. Landis, 128 Fla. 604, 175 So. 241; Perry on Trusts (7th Ed.), Section 733, and numerous cases cited. A charitable trust must remain true to the purposes of its creation. Jones vs. Home Finding Association, 191 Iowa 211, 182 N. W. 191. In Re Coleman's Estate, 66 Idaho 567, 163 Pac. 2d 847, 848, the court said: "The distinctive features of a 'charitable organization' are that it has no capital stock and no provision for making dividends or profits, but derives its funds mainly from public and private charity and holds them in trust to be expended for charitable and benevolent purposes." It Wellesley College vs. Attorney General, 313 Mass. 722, 49 N. E. 2d 221, 223, the court, speaking of a corporation, stated as follows:

"The college is a charitable corporation and all its property is held in trust in furtherance of the purposes for which it was organized. * * * It has received large donations by will and otherwise. The donors in many cases have directed that the principal be invested and the income used for the general purposes of the college, while others have limited the application of the income to some particular purpose within the general objects of the college. Some gifts have been made for the benefit of the college generally and without restrictions or conditions as to the expenditure of the principal or income. Whether the gifts were made for some specified purpose of the college or unconditionally for any general purpose of the college, the petitioner holds the property in trust, to carry out the terms and conditions under which it was given and accepted. Where no con-

ditions were imposed by the donor, then it holds and must apply the property in carrying out the charitable object for which it was incorporated. * * * Property conveyed unconditionally to a charitable corporation is impressed with a trust for the accomplishment of the corporate purposes."

Other cases to the same effect might be cited. Charitable trusts are, as already stated, recognized in this state, since we adopted the common law existing prior to the fourth year of James the First in so far as applicable in this country. Section 16-301 W. C. S. 1945. The history of such trusts and the basic reasons for recognizing them are given in Scott on Trusts, Section 348.2 and 348.3, and Clayton vs. Hallett, 30 Colo. 231, 70 Pac. 429, 59 L. R. A. 407, and we need not do so here. It would seem, accordingly that, without particularly characterizing the grants involved in this case at this place, we are here dealing with a charitable trust, or the ordinary rules relating thereto should be applied herein. That in fact appears to be recognized by all the parties hereto. So it becomes necessary to call attention to some of the rules which seemingly have a bearing herein. In 2 Bogert, Trusts and Trustees, Section 435, the author states:

"In the absence of special provisions in the trust instrument, the trustees have no power of their own motion to decide that it has become impossible or inexpedient to carry out the trust as originally planned and then to substitute another scheme. If the trustees feel that an emergency of this type has arisen, they should bring the situation to the attention of the court and ask for instructions."

That is said in connection with the doctrine of cy pres. To the same effect, see 14 C. J. S. 519. That term means "as nearly as possible." "Roughly speaking," says Bogert, supra, Section 431, "it is the principle that equity will make specific a general charitable intent of a

settlor, and will, when an original specific intent becomes impossible or impracticable of fulfilment, substitute another plan of administration which is believed to approach the original scheme as closely as possible. It is the theory that equity has the power to mould the charitable trust to meet emergencies." See also Restatement of the Law of Trusts, Section 399. It is sometimes referred to as the doctrine of Approximation. 14 C. J. S. 510-511. It is ordinarily applied to the necessary modification of the object of charity. But the same or an analogous rule has been applied in connection with the change of the agency which administers the trust. Thus, it is said in Trustees, etc. vs. Melrose, 316 Mass. 584, 56 N. E. 2d 131: "It is settled that the court is not at liberty to alter the scheme of a testator 'either as to the objects of the charity or the agents by whom it is to be administered, unless it appears to be impossible to carry out his scheme according to its terms.'" To the same effect is Fellows vs. Miner, 119 Mass. 541, 546. And see also Harvard College vs. Society etc., 3 Gray (Mass.) 280; Reagh vs. Hamilton, 194 Wash. 449, 78 Pac. 2d 555; 14 C. J. S. 510. In Gary Library vs. Bliss, 151 Mass. 364, 25 N. E. 92, the court stated: "That part of the donor's scheme which relates to the management and control of the fund and of the library cannot be disregarded as unimportant." Perry on Trusts (7th Ed.) Section 735, states: "Nor can the trustees, whether persons or corporations, appointed to administer a charity, be changed by the agreement of the parties, nor for mere convenience." In Massachusetts Charitable Mech. Ass'n vs. Beede, 320 Mass. 601, 70 N. E. 2d 825, 830, the court stated: "In general, the trustees of a charity may not delegate their powers and duties to others, much less substitute new trustees for themselves. * * * A change of trustees, when necessary, is made by judicial decree." See also In Re Kulka's Estate, 142 Ore. 104, 18 Pac. 2d 1036, 1039. Bogert, supra, Section 511,

states that: "As a rule a trustee, having once accepted a trust, cannot thereafter, through his own act alone, divest himself of the office or the responsibilities attached to the office." To the same effect is 65 C. J. 612. See also Restatement, supra, Section 106. And in Section 512, Bogert, supra, states: "From the rule that a trustee cannot resign by his own act alone follows the obvious corollary that he cannot accomplish the equivalent of resignation by transferring the trust to another." So in Grundy vs. Broome (Tex. Civ. App.) 90 S. W. 2d, 939,941, the court states that: "The general rule is that a trustee has no power, in the absence of authority conferred by the trust instrument, to appoint his successor or to convey the trust property to a third party to hold as trustee." See also comment under Section 106 and Section 175 of the Restatement, supra, and other authorities cited in the subsequent discussion herein. True, a trustee may tender his resignation, but the court is not bound to accept it. It may either compel him to perform his duty or appoint a successor. Anderson vs. Phegley, 57 Ore. 172, 110 Pac. 975, 978.

If the foregoing rules are applicable herein, then it would seem to be clear that the transfers involved in this case are void. Counsel for the plaintiffs, however, contend that a charitable corporation may transfer and sell its property when it is in financial difficulties. This contention necessitates a more detailed consideration of the power to transfer and sell on the part of such corporations. We are cited to the case of Hospital & Benevolent Ass'n vs. Arkansas Baptist State Convention, 176 Ark. 946, 4 S. W. 2d 933, referred to in 14 C. J. S. 541, holding that it is within the power of a charitable corporation to convey its real property, particularly when it becomes necessary to do so in order to perpetuate the charitable purposes of the corporation. In that case, the plaintiff hospital association con-

structed a hospital. For want of funds, it had been closed for four or five months. Negotiations were entered into with the defendant hospital association and the hospital was sold and transferred to the latter with the duty to keep up the hospital and expend money thereon. A large amount of money was spent by the defendant hospital association thereafter. It was held that the transfer of the property was valid. A like ruling was made in the case of People vs. President and Trustees of the College of California, 38 Cal. 166. In that case, an educational institution was transferred to become a part of the University of California, on account of want of sufficient pecuniary resources to carry on the college. The transfer was upheld. In Presbyterian Congregation vs. Colt's Executor, 2 Grant's Cases, 74, decided by the Supreme Court of Pennsylvania in 1853, it was held that a church and the lot upon which it is erected are private property and subject to levy and sale in the same manner as other private property. In the course of the opinion, the court said: "The power given to religious societies to hold land, was not intended to prevent them from selling it, nor to enable them to hold it against their creditors, but to hold and sell it as individuals could do, always subject to the claims of creditors." In the case of Trustees of Rush Medical College vs. University of Chicago, 312 Ill. 109, 143 N. E. 434, it appears that Rush Medical College was in financial embarrassment and desired to transfer the property to Chicago University to be continued as a medical college by that university. Instead of undertaking to make the transfer upon their own authority, the trustees of the Rush Medical College made an application to the court to authorize the transfer to be made. The court gave such authorization. There is no discussion on the question as to whether or not such authorization was essential to make the transfer valid. In the case of

Hobbs vs. Board of Education, etc., 126 Neb. 416, 253 N. W. 627, 638, it appears that the Grand Island College entered into a contract with Sioux Falls College, whereby it sought to transfer to the latter the endowment funds of the former. The question was whether it could lawfully do this, and whether the court had the power to approve and authorize such a transaction. It appears that the Grand Island College was in financial embarrassment. The court ruled that the contract was intra vires of the Grand Island College, and it approved the transaction and directed it to be carried out. Unless the approval of the court was necessary, it is quite apparent that reference thereto and to the direction that it be carried out was wholly gratuitous. Judging from the discussion by the court of the powers of courts of equity, it would seem that the court considered such approval necessary. In the case of Congregational Church, etc. vs. Attorney General, 290 Mass. 1, 194 N. E. 820, it was held that where no power of sale is conferred expressly or by implication, the trustees cannot sell land held upon a charitable trust without the authorization of the court. In Matter of First Presbyterian Soc. vs. Buffalo, 106 N. Y. 251, 12 N. E. 626, a deed to a church corporation was absolute and without conditions or reservations. The court held that the church could convey the property "with the judicial consent and approval." In 14 C. J. S. 505, it is stated, in connection with charitable trusts, that: "Where a sale is expressly forbidden, or where such a power has not been given expressly or impliedly, and a court of equity has not given its sanction, the trustees are without power to alienate, and in such a case the lands given to charity are deemed practically inalienable, it being the very essence of a charity that it shall endure forever." In Rorer's Estate, 3 Pa. D. & C. Re-

ports, 41, affirmed in 279 Pa. 313, 123 Atl. 781, the court said, among other things:

"Undoubtedly, as the donor did not provide for a remainder or reversion, the church corporation took an estate in fee, but that does not mean that the trustees or the church congregation may do with the property as they please; they are answerable to the Commonwealth, acting through the Orphans' Court, and the consent of the Orphans' Court, in the exercise of its visitorial powers, is necessary to make a good title to the land. It is a general rule that where a testator creates a valid trust for a specific charitable use, the land so held cannot be conveyed away by the trustee (see Nauman v. Weidman, 182 Pa. 263); there are, however, classes of cases where the object of the trust has come to an end or conditions have suffered a material change, in which the court will decree a sale and supervise the application of the proceeds to the same use."

In Woodring vs. Lesher, 147 Pa. Sup. Ct. Reports 340, it appears that property belonging to a church was sought to be transferred. Church services had ceased for ten years past, and the church had been abandoned. The court approved the transfer sought to be made, but it discussed at length the fact that without the approval of the court, a transfer sought to be made would not be valid, and stated, among other things, as follows:

"Before a trustee can exercise rights he must be able to point to some express or implied authority in the Act of Assembly creating the trust, or to the instrument creating it. In this case the trustees nowhere on the records of the church of the court, either expressly or by implication, have shown any authority to execute or give such an instrument. (Contract of Sale)

"In *Seif v. Krebs*, 239 Pa. 423, 86 A. 872, at page 425, the rule is laid down as follow: 'It is an undoubted rule of the law of trusts that a trustee has no power to sell trust property unless such power is conferred upon him by the instrument creating the trust, either by express words or by necessary implication. The rule is so stated

in the 28 Encyclopedia of Law, page 992, and is supported by the cases there cited. As stated in Lewis on Perpetuities, cited in *Yard's Appeal*, 64 Pa. 95, and again cited in *Nauman v. Wiedman*, 182 Pa. 263, "land dedicated to the service of charity and religion is practically inalienable," and it is there stated that the power to sell land and apply the proceeds to the same uses is exercised in this State under the Act of April 18, 1853, P. L. 503.'"

In the case of Richards vs. Wilson, 185 Ind. 335, 400, 112 N. E. 780, the court said: "Gifts of land to charity, because of their public purpose, are regarded as practically inalienable at the hands of the person or body intrusted with the offices of giving them effect (except under authority of the chancery court in the interest of the trust)." In Delaware Land & Dev. Co. vs. Central Presbyterian Church, 16 Del. Ch. 410, 147 Atl. 165, 173, the court said:

"In the absence of a power of sale in the instrument creating a charitable trust, the property conveyed for such purposes, theoretically at least, is practically inalienable; * * * While the facts should always be carefully scrutinized, a Court of Equity may, however, order the conversion of such property if it appears that such a conversion is essential to properly carry out the purposes of the trust. * * * The legislature, also, has the same right, though as in a conversion by a Court of Equity, the fund must, ordinarily, at least, be used to carry out the purposes of the original trust. * * * The authority of both the Court of Equity and the legislature is based on its rights as parens patriae."

In Jordan vs. Landis, 128 Fla. 604, 615, 175 So. 241, the court said:

"In the absence of authority conferred by the trust instrument, a trustee has no authority to appoint his successor. * * * Trustees who hold land conveyed to them in trust have no other rights that are given in the trust instrument or may be implied therefrom. 65 C. J. 732. Land held under a valid trust for specific charitable uses, cannot be conveyed away by the trustees.

* * * The mere fact that there is a deed of trust, does not give any power to sell. * * * Consequently the trustees named in the deed of 1899 had no authority expressly or impliedly given to convey the property to the Robert Hungerford Industrial School because none was given by the trust instrument or by the order of a court of chancery."

In Waller vs. Lane County, 155 Ore. 160, 63 Pac. 2d 214, 217, the court said:

"It is true that gifts of land to charity are regarded as practically inalienable by the person or body intrusted with giving them effect except under authority of chancery. Richards v. Wilson, 185 Ind. 335, 112 N. E. 780.

"If, however, the grant of land is in trust for a charity and no condition of reverter is coupled with the trust, and no provision is found in the grant forbidding it, the court may, if conditions have changed, in a suitable case, order a sale of the land either under its general equity power or under the statute. First Congregational Society of Bridgeport v. City of Bridgeport, 99 Conn. 22, 121 A. 77."

It would accordingly seem that the weight of authority is that a transfer or sale of real property held in trust cannot be made except only by and with the consent of a court of equity, or perhaps in accordance with the power granted by statute. No statutory authority is given in the state so far as we can find. The only statute which in any way would be applicable in this case appears to be Section 44-1003, which provides as follows:

"Every such corporation shall have power to sue and be sued, plead and be impleaded, in all courts of law and equity whatsoever; to have and use a common seal, and alter the same at pleasure; to contract and be contracted with in pursuance of the powers of such corporation; to purchase or receive by gift, or otherwise, personal estate, such as may be necessary or proper for the purposes of such corporation, or to dispose of the

same; to purchase or receive by gift, grant, devise or otherwise, real estate, such as may be necessary or proper for the purposes of the corporation."

It may be noted that while authority is given to dispose of personal property, none appears to have been given to dispose of real property. The testimony in the case shows that the tract of 40 acres on the northern boundary on which the equestrian statue of William F. Cody is located, is worth the sum of $2,000. That indicates that the court might or could have found a method to meet the financial embarrassment of the association during the war other than by the transfer of all the property of the association for $500. The negotiations between the town and the association began sometime before May 21, 1943, and were not completed until October 7, 1943. That proves that there was no emergency, and no excuse has been given, and cannot be given under the circumstances, for failure to call on the court for advice and direction.

In any event, the Arkansas, California and early Pennsylvania cases above cited cannot be held to be controlling herein for the reason that in those cases, no grant appears upon conditions as in the case at bar, and no prohibition of sale was contained in any certificate of incorporation as is true in this case. Tract No. 1, on which the museum is located, was held by the Buffalo Bill Memorial Association by a deed from Hiram S. Cody and others. It does not contain a power of sale. It was deeded not alone upon the condition that it should never be used for commercial purposes, but also that two members of the Cody family should always be members of the directorate of the Buffalo Bill Memorial Association. It was probably intended to provide by the latter condition that two members of the Cody family should always be a part of the governing body of the property conveyed. The language used

does not, however, say that, but it means at least that the grantors expected that the property would not be sold so as to nullify that expectation. And, since the property was held upon trust, that exception cannot be lightly brushed aside, and should be taken into consideration. The Town of Cody, as well as the directors of the association, knew that upon transfer of the property to the former, no members of the Cody family could continue on the governing body of the property, for the governing body of the town—and hence of the property if transferred to it—are elected by the people, and hence the town had no power to agree to the condition specified in the deed of the property. The deed further states: "It is also made a condition of this grant that during her lifetime, Mary Jester Allen will remain in charge of the Buffalo Bill Museum and the mementos and relics placed therein." It is a general rule that "Municipal authorities are not authorized to make a contract of employment for an unreasonably long time." 43 C. J. 893, Section 1629. See also McQuillin Municipal Corporations, Section 1356. The acceptance of this condition in the deed was equivalent to a contract of employment for life. It may be that if a court of equity had authorized the transfer of the property, the rule above mentioned would not apply, but it would seem to be clear that without such authorization, there would be no reason for not applying the rule. Taking the foregoing facts into consideration, and the rule that the provision as to the management of the trust cannot be lightly disregarded, we think that, even though the trust was financially embarrassed, we would not be justified in failing to apply the rule that only a court of equity can appoint a successor to a trustee and the further prevailing rule that a sale of trust property can only be made by authorization of such court. We think accordingly that the transfer of Tract No. 1 above mentioned to the Town of Cody was void when

such transfer was not made in pursuance of the authority granted by a court of equity. That applies of course also to the quit-claim deed of 1938. The authorities of the W. P. A. projects were bound to take knowledge of the law the same as anyone else.

Tract No. 3 and part of tract No. 2 was conveyed to the association above mentioned by Robert D. Dripps "in order to perpetuate the memory of Colonel William F. Cody." The monument and equestrian statue of Buffalo Bill is located in the northern portion of Tract No. 3. The Certificate of Incorporation of the foregoing association provides that the real property on which the historic monument and memorial statue is located shall not be alienated without the consent of the legislature of the State of Wyoming. No such consent has been given. The corporation has, of course, no greater power than that granted it by its certificate of incorporation and by statute. 14 C. J. S. 540. There is no statutory power to transfer and sell its real property as already mentioned. It is stated in Section 381 by Scott on Trusts that: "Where by the terms of the trust the trustees are forbidden to sell the trust property, it is improper for them to sell the property without application to the court even though a sale becomes necessary to carry out the purposes of trust." It is clear accordingly that the transfer of the real property on which the monument and statue is located is void without authorization by a court of equity. It is true, of course, that the monument and statue occupies but a small portion of Tract No. 3, and not all of the tract is necessary to comply with the limitation of power contained in the certificate of incorporation. However, the transfer of all of the property of the Buffalo Bill Memorial Association was made for a single consideration. In Boylston Bottling Co. vs. O'Neill, 231 Mass. 498, 121 N. E. 411, it is held that "It is also established

that a contract for a single consideration is wholly void if that single consideration is paid in part for an illegal act." A number of cases are cited. To the same effect, see 17 C. J. S. 677. We think the same or an analogous rule should be applied in the case at bar. It is true that the contract for the sale of property has been carried out and conveyances have been executed, and it is frequently held that when a contract is illegal, the parties will be left where the court finds them, but that rule is not applicable in a case where the contract is merely unauthorized rather than illegal and hence immoral. 17 C. J. S. 667.

The plaintiffs in this case to uphold the judgment herein make the following contentions: A. The officers of a charitable corporation have power to convey the property of the association when such conveyance is necessary to perpetuate the charitable purposes of the trust for which it was created; B. The conveyance constituted a considerate and deliberate renunciation of the trusteeship of the trustee in favor of the plaintiff Town of Cody which was considerably better situated and equipped to carry out and administer the purposes of the trust; C. The property was conveyed to the plaintiff town for the purpose of its preservation in keeping with the covenants and restrictions in the deed, in that it accepted the conditions contained in the deed from Hiram Cody and others; D. The trial court in equity heard and determined the facts, to which it applied the universally accepted rule that a court of equity has the power to protect the property in trust and direct the future administration of the trust. We have already discussed contention A, but we should add that if the Town of Cody claimed the property under the conveyances as successor in trust, as is now contended ,it would have been suing as trustee, and should then have alleged its representative capacity in

which the suit was brought. Trask vs. Karrick, 87 Vt. 451, 89 Atl. 472; Gilles vs. Page Estate, 154 Okla. 230, 7 Pac. 2d 490; 47 C. J. 177; 31 Cyc. 99. See also 65 C. J. 1037-1039. The pleadings determine in what capacity the parties sue. Perez vs. Wilson, 86 Cal. App. 288, 260 Pac. 838; 47 C. J. 176; 31 Cyc. 99. There is no indication in the amended petition nor in the reply filed herein that the Town of Cody held the property in controversy here as trustee. In answer to contention B above, we have already shown that a trustee has no right to renounce his trusteeship without the consent of a court of equity. Contention C has already been fully considered. Contention D, in substance, is to the effect that the proceeding before the trial court was one for the substitution of one trustee for another— the Town of Cody in place of the Buffalo Bill Memorial Association—and that the trial court made the substitution in this case. But there was no such issue as that before the trial court. The action herein was an ordinary action to quiet title. The plaintiffs alleged that they were the owners of the property. They did not ask that the town should be substituted as trustee. The summons and the published notice to absent defendants and unknown heirs make no reference to any trusteeship. Mr. Littleton, of counsel for plaintiffs, in his opening statement of the case, stated that the town claimed the property by an unqualified warranty deed and by an unqualified bill of sale. He even objected to the introduction of the Certificate of Incorporation of the Buffalo Bill Memorial Association, which contains a prohibition of sale, and shows the association to be a charitable corporation. The objection was made on the ground that the power and authority of the association to execute the deed could not be questioned. That goes to the very root of the matter here involved, and counsel completely failed to recognize that the rules of a charitable trust are applicable herein. He contended

throughout that the legal effect of the conveyances to the town could not be contradicted, and while that contention was made mainly in connection with the offer to show that the conveyances constituted only a mortgage, it also shows that he recognized no relationship of trustee and trust. It is clear that his theory in this court has been completely changed. He did not, in the trial court, take the position that the acceptance of the conditions in the deed from Hiram Cody and others made the Town of Cody a trustee. Meyer Rankin, attorney and town clerk of the Town of Cody in 1943, testified that he did not recognize that the property was subject to any charitable trust. The decree of the court herein was an ordinary decree quieting title to the property in the Plaintiffs, and adjudged them to be the owners of the property. It made no mention whatever that the Town of Cody was holding the property in trust. It did not even state that it was held subject to the conditions and reservations in the warranty deed which was given to the town. Moreover, we have already shown that the court will not lightly displace a trustee appointed in a grant to a charitable corporation. And the question as to whether or not the situation is such that a court of equity is justified in directing a change in the management of the trust must, of course, be determined as of the time when the proceeding to that end in court is pending. Nearly three and a half years had passed between the time that the deed and bill of sale were given to the Town of Cody and the time of the commencement of the action herein. The war had ended; the situation as to travel had changed, and it does not appear herein that if, at the time of the trial of the case, the Buffalo Bill Memorial Association had then been in possession of the property in controversy, collecting money in connection with the museum, that it would then have been in any financial embarrassment. While the court, upon objection made by the

plaintiffs, restricted the introduction of evidence on the question of the amount which the Town of Cody had collected, sufficient evidence appears that the town had collected a sum more than enough to pay off the indebtedness due to it from the association.

We see no escape from the conclusion that the judgment of the trial court is erroneous. It is accordingly reversed, with direction to deny the claims of the plaintiffs herein; to grant the cross-petition for reconveyance herein filed, and to make such other orders as may be necessary or proper, not inconsistent with this opinion.

*Reversed.*

RINER, C. J., and KIMBALL, J., concur.