**In re WELLS FARGO SECURITIES LITIGATION.**

**This Order Relates To All Actions.**

**No. C–91–1944–VRW.**

United States District Court,
N.D. California.

Jan. 20, 1998.

---

Melvin R. Goldman, Jack W. Londen, Morrison & Foerster, San Francisco, CA, Jeffrey Ross, Friedman, Ross & Herst, San Francisco, CA, Drucilla Stender Ramey, Executive Director and General Counsel, San Francisco, CA, William S. Lerach, Jan M. Adler, Milberg, Weiss, Bershad, et al., San Diego, CA, for defendants Wells Fargo & Company.

James M. Finberg (SBN 114850), Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, CA, class counsel.

## ORDER

WALKER, District Judge.

The plaintiffs in this case, a class of securities purchasers, brought this action against Wells Fargo for securities fraud, and the parties subsequently entered into a court-approved settlement agreement. Pursuant to the terms of that settlement, class counsel made distributions from the settlement fund to those members of the class who submitted forms identifying a recognized loss. All of the 2,619 claimants have now cashed their settlement checks.

Despite these distributions, the settlement fund still contains a residue of $35,583.12. This money came from two sources: (1) interest accrued during the period after the distribution checks were issued but before the claimants cashed them and (2) unantic-ipated savings realized in the administration of the fund. Most of the residue is attributable to the first source.

Currently pending before the court is a motion by class counsel urging the court to invoke its equitable power of cy pres to distribute the settlement fund residue to an alternate recipient. Class counsel claims that use of the cy pres power is appropriate because the administrative and postal expenses of allocating and distributing this residue to the class members would "chew up" a substantial portion of the remaining funds. See Mot re Donating Residue at 2. Class counsel (with the consent of counsel for Wells Fargo) instead urges this court to authorize the distribution of the residue to the Bar Association of San Francisco (BASF). For the following reasons, this motion will be granted in part and denied in part.

### I

In some instances, a court may employ its power under the equitable doctrine of cy pres to distribute the residue of a class settlement fund to an alternate recipient (usually a charitable organization). See Herbert Newberg and Alba Conte, Newberg on Class Actions §§ 10.15–10.17 (3d ed 1992). This power, however, is subject to two important limitations.

The first limitation concerns the equitable interests that other parties, most notably class members, may have in the residue. Under this restriction, a court may only utilize its cy pres power to distribute such residue to an alternate recipient if either (1) no parties have equitable interests in the residue or (2) distribution to such parties would be impractical. See *Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 813 (5th Cir.1989); *In re Folding Carton Antitrust Litigation* 557 F.Supp. 1091, 1110 (N.D.Ill. 1983), rev'd on other grounds, 744 F.2d 1252, 1254 (7th Cir.1984).

The second limitation on the cy pres power is the related purpose requirement. The doctrine of cy pres originated in the law of wills and trusts. In that context, courts may use this equitable power to redirect money from trusts and testamentary gifts

that would otherwise fail for legal reasons. This power does not, however, enable courts to redirect this money to *any* alternate source that may represent a worthwhile endeavor. Instead, courts must redirect the funds in a manner that best serves the original intent of the settlor or testator. Indeed, the very term cy pres suggests this limitation on the principle; cy pres is Norman French for "as near" and signifies that the donor's intent must be followed "as nearly as possible." See *Wilber v. Owens*, 2 N.J. 167, 177, 65 A.2d 843 (1949); *Town of Cody v. Buffalo Bill Memorial Assn.*, 64 Wyo. 468, 493, 196 P.2d 369 (1948). When courts employ their cy pres power, they must redirect the gift to an alternate donee that pursues a purpose similar to that of the original donee. See, for example, *Board of Education of City of Rockford v. City of Rockford*, 372 Ill. 442, 24 N.E.2d 366 (1939) (holding that cy pres could not be used to divert the proceeds of an educational trust to a civic association, even though that association's activities were undoubtedly "laudable").

The related purpose requirement also applies to the distribution of settlement fund residue. See Newberg and Conte § 10.17. In this context, a court must be careful to direct the residue to an entity that will indirectly serve the interests of class members or "others similarly situated, e.g. *future class members* who engage in future transactions of the type involved in the class litigation \*\*\*" Id (emphasis original). For example, in *Houck v. Folding Carton Admin.*, 881 F.2d 494, 502–3 (7th Cir.1989), the court approved the use of cy pres to distribute the residue of a settlement fund. Because the underlying suit involved allegations of nationwide antitrust violations, however, the court insisted that the residue be used in a manner that would help remedy problems of a similar nature and scale. Id.

In sum, before a court invokes its cy pres power to distribute the residue of a class settlement fund to an alternate recipient, it must ask three questions: (1) to whom does the residue belong, (2) would it be practicable to distribute the residue to its owners and (3) if not, who is an appropriate alternate recipient? The court will address each of these questions in turn.

## II

█ The answer to the first question in this case is that the class owns the residue. The residue consists almost entirely of the interest that accrued after distributions were made but before class members actually cashed their checks. Class members were the equitable owners of these funds from the moment the court-approved distributions were made, not merely from the moment the checks were cashed. They are thus entitled to the time value of this money from the point of distribution forward (i.e., the interest that accrued after the checks were mailed).

Of course, it could be said that certain class members may have greater claims to the residue than others. For example, if one class member cashed his distribution check immediately while another waited for several months to do so, the interest that accrued in the residue would appear to belong to the person who waited. Nonetheless, it would be unduly expensive and burdensome for class counsel to determine (1) which class members waited to cash their checks, (2) how long they waited and (3) how much of the residue therefore truly belongs to them. Furthermore, applying a variation of the old saw, "you snooze, you lose," it would seem unwise to expend large portions of the residue to ascertain the exact interests of claimants whose apparent apathy, at least in part, caused the need for such a calculation in the first place. The court will therefore ignore this point and conclude that the residue belongs to the class members according to their pro rata interests in the settlement. (Consistent with the earlier distributions, each claimant's pro rata share depends on the amount of shares purchased and thus the amount of injury suffered.)

While almost all of the residue consists of accrued interest, a small portion is attributable to the fact that the costs of administering the fund were less than originally anticipated. In an earlier order, the court suggested that some of the residue may therefore belong to Wells Fargo, the party who presumably overpaid into the settlement fund. Responding to this suggestion, counsel for Wells Fargo has informed the court that Wells Fargo has no interest in

the settlement residue, despite the fact that it may have paid slightly too much for administrative costs. Under the terms of the settlement, once certain events took place (i.e., the distribution to the class members), Wells Fargo's interest in the settlement fund was completely extinguished. Without investigating the matter further, the court will rely on Wells Fargo's representation. The court therefore finds that the residue belongs in its entirety to the class members.

## III

The second question posed is whether it would be practical to distribute the residue to the class members. The answer is that it will be practical to distribute this money to some but not all of the class members.

### A

When this motion was first filed, class counsel submitted almost no evidence to aid the court in assessing the practicality of a distribution to the class members. Class counsel instead merely offered the bald assertion that the costs of such a distribution would "chew up" the residue. It was not immediately obvious to the court, however, that dividing more than $35,000 among the 2,619 class members would in fact deplete the residue. See Oct 10 Ord at 4–5. The court noted that even if the expense of allocating the residue and distributing the checks were $1.50 per claimant, on average each claimant could still receive nearly $12.00. See id.

In a timely and thorough response to the October 10 order, class counsel provided information regarding (1) the class, (2) the feasibility of distributing the residue to the class and (3) alternate recipients for the residue. Along with this additional information, class counsel again argued that the administrative costs of distributing the residue to the class members would render such a distribution impracticable. Specifically, class counsel claims that the administrative costs of distributing the residue (i.e., processing and mailing the checks) to the class would be

approximately $5.50 per claimant. See Janvrin Decl at ¶ 2.[1] If class counsel were to issue a check to every class member, the total administrative cost would therefore be approximately $14,400. See id.

In an attempt to bolster the argument that such a distribution would be foolish, class counsel notes that after these administrative costs are deducted, the average claimant would only receive approximately $8.00. For reasons that the court has already explained, this is not a completely negligible sum. Furthermore, in making this argument, class counsel has focused attention on only the "average" claimant.

One need not go far down the list of 2,619 claimants to discover that there are wide disparities between the pro rata shares to which some of the class members are entitled. For example, Frederick Allen's pro rata share of the residue is $0.03 whereas the Annenberg Trust's pro rata share is $1736.46. similarly, while George Dean Campbell is entitled to only $0.38 from the residue, the California Public Employee Retirement System (CalPERS) can claim $640.50. In light of these wide disparities, the court refuses to look only at the "average" class member, and instead will consider the impact that various distribution schemes will have on all class members.

### B

In determining whether it is practical to distribute the residue to the class members, the court envisions four potential schemes for distribution.

#### 1

The court could simply order class counsel to distribute the residue according to each claimant's pro rata share. One need not contemplate the details of this plan at length, however, before the devil rears his ugly head. Obviously, it would be absurd to spend $5.50 in class funds to send a three cent check to Mr Allen or a thirty-eight cent check to Mr Campbell. Furthermore, if class counsel were to do so, the $5.50 for administrative

---

1. While the court is somewhat surprised that the estimated cost per claimant is so high, it appears that Mr Janvrin has considered certain factors that the court did not in the October 10 order (i.e., the cost of updating mailing lists and answering questions from claimants). The court will therefore accept this representation.

expenses would have to come out of the residue fund. This would necessarily deplete the amount of money available for those class members entitled to larger portions of the residue. No doubt, class counsel has brought the current motion to avoid such an undesirable result.

2

Under the model proposed by class counsel, the court would simply disperse all of the residue to the BASF. Doing so would incur few administrative expenses. At the same time, however, distribution of class members' property in the fashion proposed would be tantamount to a tax upon the entire class. Moreover, this "tax" would not even be levied for the indirect benefit of the class members. Instead, class counsel proposes a tax for the benefit of a purely private entity. No doubt the BASF does many worthwhile things, as described in the declaration of its executive director, Drucilla Stender Ramey. One may question, however, whether class members would choose to tax themselves for the benefit of a lawyers' group, especially one that serves a city in which most class members do not live.

The fact remains that this money belongs to the class members, and it is they who should decide whether and to whom to donate it. For example, California's state employees may not want CalPERS to follow a practice whereby it simply forbears its claims to settlement fund residues. Similarly, the Annenberg Trust most likely has a staff of advisers who determine which charitable donations best serve the goals of that trust. Neither the court nor class counsel should assume this role.

3

Another way the court could attempt to avoid these problems would be to order class counsel to pay the administrative costs of a full distribution up front out of the residue. Since the estimated administrative cost of a full distribution to all class members is approximately $14,404.50, such a payment would leave $21,178.70 for pro rata distribution among the class members.

This approach, however, suffers from some of the same infirmities as dividing the residue in strict accordance with each class member's interest in the settlement. Under this approach, the class as a whole (through the residue) would still pay $5.50 so that the Mr Allens of the class could get five or ten cent checks. Furthermore, because the administrative costs would be deducted from the residue in one lump sum, those class members with greater pro rata shares in the residue would necessarily bear a greater burden. Since some class members own more of the residue, more of their money would be used to cover the administrative costs. Yet, these class members would be receiving the same services (i.e., the processing and delivery of one check) as everyone else in the class. It would therefore be unfair to ask them to shoulder an extra burden if they will only enjoy the exact same benefit.

4

■ Finally, the court could, and indeed will, (1) order class counsel to distribute only those pro rata shares of the residue that are large enough to justify the administrative costs of such distributions and (2) use its cy pres power to direct the remaining funds to an alternate recipient. In other words, only those class members whose pro rata shares of the residue are large enough to justify the administrative expenses of distribution should get their money minus such costs.

The difficult question is where to draw the line between class members whose claims are large enough to warrant the expenses of distribution, and those whose claims are not. The court could simply direct class counsel to pay all claimants who are entitled to more than $5.50 from the residue. Such an order would, however, produce some odd results. For example, Carl Casagrande is entitled to $6.02 from the residue. Under this approach, the claims administrator would spend $5.50 to send Mr Casagrande a check for fifty-two cents. The court concludes that the line must be set at a higher point than $5.50.

Admittedly, determining the exact point is somewhat arbitrary. Nonetheless, there is an appealing symmetry to the proposition that the cost of the distribution should not be greater than the amount of the distribution itself. Assuming class counsel's figures are correct and the cost of distribution will be $5.50 per claimant, the court will therefore order class counsel to give each class member his share of the residue so long as that share is greater than $11.00. According to

the court's calculations, this includes all class members who received more than $3,286.36 in the first distribution. If further investigation reveals that distribution will actually cost less than $5.50 per claimant, class counsel is directed to distribute pro rata shares to each class member whose share is more than double this revised cost figure.

### III

The one lingering issue, of course, is the third question: what to do with the remaining portion of the residue. Because it would be impractical to distribute funds to those class members whose pro rata shares of the residue are less than $11.00, the court will invoke its cy pres doctrine and redirect this money to an alternate recipient.

As indicated above, class counsel urges the court to direct this money to the BASF. In support of this motion, class counsel has provided evidence that the BASF pursues commendable ends. See Ramey Decl. Nonetheless, it is unclear how distribution of the residue to this lawyers' group would aid class members or similarly situated parties in the future. Much like the civic association that served no educational purposes in *Rockford,* the BASF and its efforts to promote the legal profession and educate attorneys may be "laudable," but they are nonetheless attenuated from the interests of the class members. Class counsel's proposal to distribute the residue to the BASF is particularly ironic in a securities class action given that Congress recently revised some of the procedures applicable to these actions because it found that too much of the money from such litigation ended up in the hands of lawyers rather than investors. See Private Securities Litigation Reform Act of 1995, Senate Report No 104–98, 104th Cong, 1st Sess, 5–9 (1995) in 2 USCCAN 684–88 (1995).[2]

There are a number of organizations, however, that do serve the interests of the current class members or future class members in similar litigation. In reaction to the court's initial skepticism with regard to giving the money to the BASF, class counsel has suggested the Stanford Law School Securities Class Action Clearinghouse (the Clearinghouse) as an alternate recipient. This is an apt suggestion. The Clearinghouse provides pertinent information on pending securities class actions free of charge to the public via the Internet, as more fully set forth in the declaration of Stanford Law Professor Joseph Grundfest. In addition, the Clearinghouse is helping to effectuate the local rules of this court governing securities litigation. See Civ LR 23–2. The court will therefore order class counsel to disperse the remainder of the residue fund to the clearinghouse.

While the court agrees with class counsel's contention that the Clearinghouse is an appropriate alternate recipient, the court also notes that similar groups may also be proper recipients of cy pres distributions in future securities class actions. The Council of Institutional Investors, to pick one example, seeks to further the interests of defrauded investors. It might therefore be a suitable recipient in future situations such as the one at bar, and it would certainly be a more suitable recipient than a local bar association.

### IV

For the foregoing reasons, the court DENIES in part and GRANTS in part class counsel's motion (Doc # 160, Pt # 1) to disperse the residue of the settlement fund. Specifically, the court directs class counsel to:

1. distribute all pro rata shares in the residue that are greater than $11.00 to the class members to whom they belong;

2. subtract the cost of each distribution from the pro rata share being distributed; and

3. disperse all remaining residue funds to the Stanford Law School Securities Class Action Clearinghouse.

IT IS SO ORDERED.

---

2. Under the court's distribution plan, lawyers' groups are not entirely shut out. Although none of the cy pres distribution will go to such an organization, the American Bar Association (one of the class members) will receive a check for approximately $12.43 (its $17.93 share minus the $5.50 processing fee).